Larry RICE, et al., Appellants,

v.

John ASHCROFT, et al., Respondents.

No. WD 44470.

Missouri Court of Appeals, Western District.

May 7, 1991.

Motion for Rehearing and/or Transfer to Supreme Court Denied June 27, 1991.

Application to Transfer Denied July 18, 1991.

Robert C. Babione, St. Louis, for appellants.

William L. Webster, Atty. Gen., Gary L. Gardner, Asst. Atty. Gen., Jefferson City, for respondents Ashcroft, Carnahan and Webster.

James J. Wilson, City Counselor, Edward J. Hanlon, Asst. City Counselor, St. Louis, for Schoemehl and Jones.

John A. Ross, County Counselor, James H. White, Deputy County Counselor, St. Louis, for Westfall.

Before LOWENSTEIN, J., Presiding, and TURNAGE and FENNER, JJ.

LOWENSTEIN, Judge.

This suit involves the proposed construction of a covered stadium and supporting facilities to expand the Cervantes Convention Center in downtown St. Louis City. The State, City, and County have agreed to pay rent as tenants of a domed stadium and expanded convention center to be constructed by a statutorily created regional authority. The plaintiffs, taxpayers of the State of Missouri (State), St. Louis City (City), and St. Louis County (County), filed this action for declaratory and injunctive relief to stop the project. On stipulated facts, the trial court ruled for the defendants, who are state officials, including the governor of Missouri, as well as other City and County officials.

In 1988, the state legislature passed Sections 67.650–67.658, RSMo Cum.Supp.1990, which set up a Regional Convention and Sports Authority (Authority) for St. Louis. In July 1990, the State, the City, the County and an entity called St. Louis NFL Corporation (SLNFL) entered into a "Project Agreement" (Agreement) to finance, build and operate an expanded convention facility, which would hopefully attract a professional football team to replace the Cardinals.

The project calls for the Authority to issue bonds to finance construction. Section 67.653.1(10). Under § 67.653.1(1) the Authority has the specified power to construct and lease "convention centers," and a "sports stadium."

Under the Agreement, the State, County, and City agreed to lease the proposed new stadium facility from the Authority for thirty years. The County is obligated to pay one-fourth of the rent and is limited to the money derived from a 3½% hotel tax levied in the county. *See* § 67.657.3 *supra.* The City is to pay one-fourth, and the State is to pay one-half of the yearly rent. The same percentages hold true for the "asset preservation costs," which are capped two percent of cost or $4 million a year. None of the State's, City's, or County's obli-

gations are deemed a general obligation or other form of debt. The City, State and County would lease the facilities to another entity, known as the Convention and Visitors Commission (CVC) for management. SLNFL would then sublease the stadium from CVC for football games at a rate of $250,000 per day. Neither the City nor the County submitted the agreement for voter approval. The City and County adopted ordinances allowing the agreement. The lease payments would be used to retire the Authority's bonds and maintain the stadium.

Appellants present three points on appeal: 1) that the trial court erred in failing to conclude that the Missouri Constitution should be construed to hold that the voters of the City and County have the exclusive power to approve a scheme such as the proposed deal for a multi-purpose covered facility; 2) that the trial court erred in concluding that the City Charter provision regulating public works, which requires that the Board of Public Service complete a recommendation and cost estimate, does not apply to this Agreement because it should apply in that project is still a "city" project even though the County and State are partners in the Agreement; and, 3) the court erred in concluding that the Agreement does not violate Mo. Const. Art. III, § 38, which prohibits the general assembly from granting money or lending credit to private persons or corporations, because the bondholders' trustee controls the project, the Authority is an agent for the bondholders, and SLNFL is the beneficiary of the arrangement.

I.

The appellants argue that under Mo. Const. Art. VI, §§ 30(a) and (b) the City and County could not enter into the Agreement without first submitting the project for voter approval. These constitutional provisions give the freeholders and voters of the City and County, with voter approval, the authority to establish metropolitan districts for the functional administration of services common to the area. Appellants relied on *State ex rel. Dalton v.*

*Metropolitan St. Louis Sewer District,* 365 Mo. 1, 275 S.W.2d 225, 228 (banc 1955), which states:

> The apparent intent is to give the freeholders, with the approval of the voters, power to do whatever the Legislature could ordinarily do with respect to the creation, organization and authority of such a district.

Appellants' argument ignores that the City, County, and State are tenants to a lease. The building and operation of the stadium is run by a separate entity specifically authorized by the legislature in § 67.-650 *et seq.* Respondents correctly point out that Missouri Statutes set up numerous authorities that act through appointed commissioners. *See e.g.* § 67.601 *et seq.* (St. Louis City and County Regional Convention and Visitors Commission).

The County Sports Complex Authority for Jackson County was created under § 64.920–950, RSMo 1986. As does the Authority in the case at bar, the Jackson County Authority operates through statutory guidelines, § 64.930, under duly appointed commissioners. *See Waris v. Carnes,* 760 S.W.2d 573 (Mo.App.1988). As was discussed in *Waris,* the Authority is a separate and independent entity from Jackson County. *Id.* at 575.

The trial court here cited to *Cape Motor Lodge v. City of Cape Girardeau,* 706 S.W.2d 208 (Mo. banc 1986), in concluding that 30(a) and (b) did not leave those constitutional provisions as the only means of creating metropolitan districts. *Cape* recognized that under the provisions of enabling legislation contained in § 70.220, a city and a state university could combine to build a "multi-use center." *Id.* at 208.

There is no Supreme Court case which has invalidated any statutorily enabled metropolitan district because of non-compliance with a voter approval provision under Art. VI, § 30. This court may not so scuttle §§ 67.650–.658. Art. V, § 3, and hold that voter approval by the City or County of this project agreement was required. The first point is denied.

## II.

■ The Appellants argue that the trial court erroneously declared and applied the law by concluding Art. XXII, § 1 of the St. Louis City Charter did not apply here as a condition precedent to the approval of the Project Agreement.

Section 1 of Charter requirement provides:

> No ordinance for public work or improvements of any kind, or repairs thereof, shall be adopted, unless prepared and recommended by the board of public service with an estimate of the cost endorsed thereon.

The appellants rely on the following language from *Baum v. City of St. Louis,* 343 Mo. 738, 123 S.W.2d 48, 49–50 (1938):

> [I]t was the design of the framers thereof that every kind and character of the public work or improvement, or the reconstruction and repairs thereof, should be under the supervision and control of the board of public improvements and that no work or improvements of that character or any contract for the doing of the same should be valid or binding without authorized by ordinance recommended by said board, after faithfully complying with all charter requirements prerequisite to its action in the premises. The clear purpose of the charter is and was to provide a wise, comprehensive, durable, and symmetrical system of public improvements, create a board of public works, and place it in charge thereof, with power and authority to see that all public work desired by the City should conform to that system. The object of placing the system of improvements in the hands of the board was to secure to the public, and the owners of the property affected by the work, the benefit of the knowledge, skill, and unbiased judgment of a body of scientific men, unaffected by local influences, incident to all public improvements.
>
> The purpose of the freeholders in thus restricting the assembly is manifest and twofold. They sought to create a board whose experience and ability would especially fit it for the duty of contracting for

a vast system of public improvements, and whose estimates should guide the assembly in entering upon them; and, secondly, to guard against extravagance by requiring that, before public work was ordered to be done, there should be expert estimates made thereof. (Citations omitted).

The following portion of the trial judge's conclusions are dispositive in denying this point:

The provision of Article XXII, § 1 of the City Charter which provides that any ordinance for a public work must be recommended by the City's Board of Public Service *applies only to public works of the City itself.* The proposed stadium will be constructed by the Stadium Authority, an entity entirely separate from the City. The City's only participation in the project, from a legal standpoint, is as a co-lessee of the facility under the Prime Lease. Other sections of Article XXII of the Charter specify how materials are to be selected for City public works and how such public works may be financed. It is simply untenable to argue that the City can be a lessee of property only where the construction of that property complies with Charter provisions obviously intended to apply only to the construction of public works by the City itself. (Emphasis added.)

### III.

◼ The last point, without applicable supporting authority, proclaims that the Project Agreement violates constitutional provisions prohibiting the general assembly from granting money or lending credit to private persons or corporations. *E.g.,* Art. III, §§ 38(a), 39(1) and 39(2). The appellants contend the real beneficiaries of the agreement are the "prospective bond holders" of the Authority and the franchise-less SLNFL corporation, all of whom benefit from "payment of the 'rents' through annual appropriations."

The only citation supplied to the Court in support of this point is to *Curchin v. Missouri Industrial Development Board,* 722 S.W.2d 930 (Mo. banc 1987). *Curchin* involved a state Industrial Development Board created under § 100.265, RSMo Supp.1985, to issue revenue bonds, which allowed a state tax credit for any losses on a default. *Id.* In upholding the taxpayer's declaratory action based on a violation of Art. III, § 38(a) for use of the tax credit, the court said at page 934:

In determining whether there is sufficient public purpose behind a grant of public money, Missouri has used the "primary effect" test. Under this test,

[t]he true distinction drawn in the authorities is this: If the primary object of a public expenditure is to subserve a public municipal purpose, the expenditure is legal, notwithstanding it also involves as an incident an expense, which, standing alone, would not be lawful. *But if the primary object is not to subserve a public municipal purpose, but to promote some private end, the expense is illegal, even though it may incidentally serve some public purpose.* (Emphasis in original.)

\*       \*       \*       \*       \*       \*

... we have held grants with a primarily private effect to be unconstitutional, despite the possible beneficial impact upon the economy of the locality and of the state.

The ruling in *Curchin,* however, was predicated on the unqualified use of state tax credits available to bondholders, not on the utilization of the state using revenue bonds to help the growth of Missouri industry. *Id.*

As opposed to the *Curchin* bonds, in the case at bar, § 67.653.1(10)(d) provides:

Bonds issued under the provisions of sections 67.653 to 67.655 shall not constitute a debt, liability, or obligation of this state, or any political subdivision of this state, nor shall any such obligations be a pledge of faith and credit of this state, but shall be payable solely from the revenues and assets held by the authority. The issuance of bonds under sections 67.-653 to 67.655 shall not, directly, indirectly, or contingently, obligate the state of Missouri or any political subdivision

thereof, or the authority, to levy any form of taxation therefor to make any appropriation for their payment. Each obligation or bond issued under sections 67.653 to 67.655 shall contain on the face thereof a statement to the effect that the authority shall not be obligated to pay the same nor the interest on such bond, except from the revenues received by the authority or assets of the authority lawfully pledged therefor, and that neither the faith and credit nor the taxing power of this state or of any political subdivision of this state is pledged to the payment of the principal of or the interest on such obligation or bond.

The defendant's lease payments to the Authority do not violate the constitution. The funds go from one governmental entity to another. *See Enright v. Kansas City*, 536 S.W.2d 17, 19 (Mo. banc 1976) (involving payments from Kansas City to the Kansas City School district.)

*St. Charles City–County Library District v. St. Charles Library Building Corp.*, 627 S.W.2d 64 (Mo.App.1981), further buttresses the judgment. In that suit a public library district devised a plan where a not-for-profit chapter 355 corporation was formed to receive land from the district, on which it built a library and would lease back the facility to the district. The financing by the corporation for the construction loan was facilitated by assigning the lease payments from the district to the lender. The Eastern District upheld the arrangement of the corporation using the library's rentals to secure financing. *Id.* at 69. It went on to hold such a set up did not violate Art. VI, § 23 of the Constitution which forbids a political corporation or subdivision of the state to grant public money to an individual. *Id.* 69–70.

The burden is on the appellants to show the legislature's determination this Regional Convention and Sports Authority Act is to serve a public purpose was arbitrary and unreasonable. *State ex rel. Wagner v. St. Louis County Port Authority*, 604 S.W.2d 592, 597 (Mo. banc 1980). They have failed to sustain this burden.

Any benefits to private persons under §§ 67.650–658 are incidental and do not take away from the primary purpose of legislation—to increase convention and sports activity in the St. Louis City–County area. *Roberts v. Maryville*, 750 S.W.2d 69, 72 (Mo. banc 1988); *Jardon v. Industrial Development Authority of Jasper County*, 570 S.W.2d 666, 674 (Mo. banc 1978).

The points are denied. The judgment is affirmed.