1997 OK 117

The STATE of Oklahoma ex rel. William Daniel BROWN; Alvin P. Spears; Lucille N. Spears; Vince P. Sharpe; Donna K. Sharpe; Joseph A. Barter; Debra S. Barter; Patrick H. Woolley; Joan D. Woolley; and John R. Barter, Appellants,

v.

The CITY OF WARR ACRES, an Oklahoma municipal corporation; Jessie Simmons; Dan Maxey; John Webster; John Baker; Gary Stevens; Gene Hodges; Leonard Johnson; Richard Phillips; Kevin Kent; Jesus Morales; Paul Hartmann; Fletcher Williams; Roy Brooks; Tommy Horsley; Gene Warr and John R. Repass, Trustees of the Security Trust Revocable Trust dated March 29, 1990; Community Bank & Trust Co., an Oklahoma banking corporation; and Wal–Mart Stores, Inc., a Delaware corporation, Appellees.

No. 88629.

Supreme Court of Oklahoma.

Sept. 30, 1997.

William F. Comstock, James R. Moore, Horning Johnson Grove Moore Hulett & Thompson; James M. Levine, Oklahoma City, for appellants.

Michael W. Brewer, Donya H. Dunn, Hiltgen & Brewer, P.C., Oklahoma City, for Wal–Mart Stores, Inc., appellee.

Margaret McMorrow–Love, Oklahoma City, for Jessie Simmons, John Webster, Dan Maxey, Gary Stevens, Gene Hodges, Leonard Johnson, Richard Phillips, Kevin Kent Jesus Morales, Paul Hartmann, Fletcher Williams, Tommy Horsley and City of Warr Acres, appellees.

Joe Rolston, III, Clay P. Booth, Woodard & Rolston, Oklahoma City, for Community Bank & Trust Co., appellee.

A.P. Murrah, Jr., Melvin R, McVay, Jr., Thomas G. Wolfe, Phillips McFall McCaffrey McVay & Murrah, Oklahoma City, for Gene Warr & John Repass, Trustees of the Security Trust Revocable Trust Dated March 29, 1990, appellees.

HODGES, Justice.

¶ 1 This qui tam [1] action requires this Court to revisit "public purpose" in the context of sections 14, 17, and 26 of article X of

---

1. A qui tam action is authorized by sections 372 and 373 of title 62 of the Oklahoma Statutes. "Section 372 authorizes triple recovery against state or municipal officers and others involved, of money improperly paid or property improperly transferred . . . in pursuance of unauthorized or fraudulent contracts or agreements." *State ex. rel. Scott v. State ex rel. University Hosp. Auth.,* 887 P.2d 1385, 1386–87 (Okla.Ct.App.1994). It provides:

Every officer of the state and of any county, township, city, town or school district, who shall hereafter order or direct the payment of any money or transfer of any property belonging to the state or to such county, city, town or school district, in settlement of any claim known to such officers to be fraudulent or

the Oklahoma Constitution. This Court holds that the expenditure of public funds challenged in this action meets the public purpose requirement of sections 14 and 17. In addition, the expenditure did not violate section 26 of article X.

¶2 The City of Warr Acres (City) is a relatively small community surrounded by Oklahoma City. Wal–Mart Stores, Inc. (Wal–Mart) wished to relocate and expand an 80,000 square feet store located at Northwest Highway and Rockwell in Oklahoma City. In 1990, Wal–Mart approached Security Trust Revocable Trust (Security Trust)[2] which owned a tract of land located in Warr Acres about one mile from Wal–Mart's existing Northwest Highway store. The tract was large enough to accommodate the 125,000 square feet store it wished to build.

¶3 Security Trust was unwilling to sell the property to Wal–Mart. Nor would it enter a long-term lease of the property for the amount Wal–Mart was offering to pay.

City officials met with Wal–Mart and Security Trust to structure a plan by which the City would induce Security Trust to enter a long-term ground lease with Wal–Mart. The inducement was to be a United States Treasury Strip Security, a zero coupon bond, which the City purchased on April 12, 1991, in the face amount of $499,858.03, along with the interest the investment was to earn over a fifty-year period. On January 9, 1992, the Warr Acres City Council adopted Resolution 214 authorizing the Mayor and other appropriate officials to approve and execute an "economic development" contract with Security Trust. This authorization followed a feasibility report which projected sales tax revenues to be approximately $400,000.00 per year from the Wal–Mart store. It also followed a legal opinion which assured the City Council that the plan was a constitutionally permissible form of economic development.

¶4 Three agreements implemented the plan: an Economic Development Contract

void, or in pursuance of any unauthorized, unlawful or fraudulent contract or agreement made or attempted to be made, for the state or any such county, city, town or school district, by any officer thereof, and every person, having notice of the facts, with whom such unauthorized, unlawful or fraudulent contract shall have been made, or to whom, or for whose benefit such money shall be paid or such transfer or property shall be made, shall be jointly and severally liable in damage to all innocent persons in any manner injured thereby, and shall be furthermore jointly and severally liable to the state, county, city, town or school district affected, for triple the amount of all such sums of money so paid, and triple the value of property so transferred, as a penalty, to be recovered at the suit of the proper officers of the state or such county, city, town or school district, or of any resident taxpayer thereof, as hereinafter provided.

Section 373 of title 62 allows resident taxpayers to bring an action "to recover the section 372 penalty or to recover any money expended ... if the appropriate officer fails or refuses to bring the action after demand by ten taxpayers. The taxpayer bringing the action is entitled under section 373 to one half of the amount recovered as a reward." *State ex rel. Hettel v. Security Nat'l Bank & Trust Co.*, 922 P.2d 600, 606 (Okla.1996). Thus, "[t]he qui tam Taxpayer wages war for the City. If the battle is won, the 'spoils of war' go to the City and a reward to the qui tam plaintiff." *State of Oklahoma ex rel. Trimble v. City of Moore*, 818 P.2d 889, 895 (Okla.1991). Section 373 provides:

Upon the refusal, failure, or neglect of the proper officers of the state or of any county, township, city, town, or school district, after written demand made upon them by ten resident taxpayers of the state or such county, township, city, town, or school district, to institute or diligently prosecute proper proceedings at law or in equity for the recovery of any money or property belonging to the state, or such county, township, city, town, or school district, paid out or transferred by any officer thereof in pursuance of any unauthorized, unlawful, fraudulent, or void contract made, or attempted to be made, by any of its officers for the state or any such county, township, city, town, or school district, or for the penalty provided in the preceding section, any resident taxpayer of the state or such county, township, city, town, or school district affected by such payment or transfer after serving the notice aforesaid and after giving security for cost, may in the name of the State of Oklahoma as plaintiff, institute and maintain any proper action which the proper officers of the state, county, township, city, town, or school district might institute and maintain for the recovery of such property, or for said, penalty; and such municipality shall in such event be made defendant, and one-half (½) the amount of money and one-half (½) the value of the property recovered in any action maintained at the expense of a resident taxpayer under this section, shall be paid to such resident taxpayer as a reward.

**2.** Two individual appellees, Gene Warr and John Repass, are the trustees of Security Trust.

between the City of Warr Acres and Security Trust; an Escrow Agreement among the City, Security Trust, and Community Bank and Trust Co.; and a Ground Lease Agreement between Security Trust and Wal–Mart. Wal–Mart leased the land for a primary term of twenty years. During the primary term, Wal–Mart will receive no inducement from the City and it will pay Security Trust $23,500.00 monthly ($285,000.00 annually) to lease the land. Beginning in the year 2012,

| Years | Annual City Inducement |
| --- | --- |
| 1–20 | $ 0.00 |
| 21–25 | $112,000.00 |
| 26–30 | $161,000.00 |
| 31–35 | $216,125.00 |
| 36–40 | $278,140.63 |
| 41–45 | $347,908.20 |
| 46–50 | $426,396.73 |

The total of all payments scheduled to be made by the City to Security Trust is $7,707,852.80.

¶ 6 If the lease is terminated at any point during the fifty-year period, any funds remaining in escrow are to be transferred to the City. The plan is structured in such a way that the City's inducement payments come only from the escrow account.

¶ 7 Wal–Mart built the new 125,000 square feet store. Sales tax revenues from the store have averaged approximately $650,000.00 per year.

¶ 8 On July 29, 1994, ten resident taxpayers made demand on the officers of the City, pursuant to title 62, section 373, of the Oklahoma Statutes, to recover the Treasury Strip Security. The taxpayers filed this action on August 3, 1994, against the City, its council members, Community Bank, and Wal–Mart to recover all expenditures made by the City in furtherance of the economic development plan. On May 15, 1995, the taxpayers amended their Petition to include Security Trust and its trustees as defendants.

¶ 9 Except for Community Bank, all parties filed motions and/or cross motions for

Wal–Mart or a successor entity acceptable to the City may extend the lease through six, five-year options. Security Trust will receive no inducement from the City throughout the primary term.

¶ 5 The investment and its accumulated interest will remain in escrow and grow to a value of $2,557,000.00 by 2011. Then, if Wal–Mart or its successor exercises an option to extend the ground lease, the following schedule of payments will go into effect:

summary judgment. Taxpayers asserted two causes of action in their second amended petition. However, only taxpayers' first cause of action was before the District Court in these motions and consequently it is the only claim involved in this appeal.

¶ 10 Taxpayers' motion argued that all expenditures by the City in furtherance of the Economic Development Contract and the Escrow Agreement violated sections 14, 17, and 26 of article X of the Oklahoma Constitution and were thus illegal. Defendants argued that the City's expenditures were proper. The District Court of Oklahoma County sustained defendants' motions for summary judgment and overruled taxpayers' motion for summary judgment. The order was filed as a final judgment pursuant to section 994 of title 12 of the Oklahoma Statutes. Taxpayers now appeal.

I. Public Purpose Requirement

¶ 11 Both sections 14 and 17 of article X of the Oklahoma Constitution embrace a "public purpose" requirement. Section 14 restricts the use of public funds to expenditures for a public purpose.[3] That provision's

---

3. Section 14 of article X of the Oklahoma Constitution provides:

Taxes shall be levied and collected by general laws, and for public purposes only, except that taxes may be levied when necessary to carry into effect Section thirty-one of the Bill of Rights. Except as required by the Enabling Act, the State shall not assume the debt of any, county, municipal corporation, or political subdivision of the State, unless such debt shall have been contracted to defend itself in time of war, to repel invasion, or to suppress insurrection.

correlative limitation, section 17,[4] was "adopted for the purpose of preventing the investment of public funds in private enterprises." *Lawrence v. Schellstede,* 348 P.2d 1078, 1082 (Okla.1960).

¶ 12 Economic development was recognized as a legitimate public purpose in *Burkhardt v. City of Enid,* 771 P.2d at 611. Proponents of the challenged expenditures argue that it is constitutionally permitted and compare it to the economic development plan approved in *Burkhardt.*

¶ 13 In *Burkhardt,* voters approved a plan by which a public trust provided economic development by purchasing a privately owned college campus and leasing it back to the former owners. Upholding the plan under sections 14 and 17 of article X, this Court held that "[e]conomic development is a legitimate public purpose for which public funds may be expended." *Id.* Further, the plan did not "lose its public purpose merely because it involve[d] a private actor." *Id.*

¶ 14 The plan in *Burkhardt* met the public purpose requirement. The city maintained control jointly with the university over operating capital and scholarship funds. The plan was not a gift or loan to a private enterprise because there was adequate consideration from the private actor in the form of direct economic benefits from the university's presence and the obligations it assumed under the plan. *Id.*

¶ 15 The economic development plan approved by the Warr Acres City Council was structured upon the legal guideposts set out in *Burkhardt.* The City received adequate consideration under the plan by which Warr Acre's best commercial tract was developed by the country's largest retailer. Sales tax collections from the store have greatly exceeded the projected $400,000.00 per year. Additional jobs were provided and the tax base for the public school system was greatly expanded.

¶ 16 The City also obtained accountability from Security Trust. In the event that Wal-Mart or a successor retail business does not exercise an option to lease the land beyond the primary term, all public money reverts to the City. In addition, Security Trust agreed that "so long as this contract with the CITY is in full force and effect, that it will not take any action nor consent to any amendment to said Ground Lease Agreement that will in any manner materially impair or adversely affect the rights of the CITY...." Security Trust cannot increase the rent regardless of changing economic conditions or changes in the cost or value of money from 1992 through the year 2011.

¶ 17 The City Council is the legislative body of a city. As such, it is its function to determine what expenditures are designed to promote the public good and welfare of the city and its inhabitants. It has no limitations as to expenditures, "save and except those which are expressly placed on its exercise by the Constitution of the State." *Dixon v. Shaw,* 122 Okla. 211, 253 P. 500, 501 (1927).

¶ 18 The term "public purpose" should not be construed "in a narrow or restrictive sense." *Burkhardt* 771 P.2d at 610 (quoting *Helm v. Childers,* 181 Okla. 535, 75 P.2d 398, 399 (1938)). Courts are to give great deference to a legislative body's determination that a particular project will serve a public purpose. In reviewing that determination, "courts cannot interfere to arrest legislative action where the line of distinction between that allowable and that which is not is faint and shadowy." *Childers,* 75 P.2d at 399. Such a determination should be reversed only upon a clear showing that it was manifestly arbitrary, capricious, or unreasonable. *R.E. Short Co. v. City of Minneapolis,* 269 N.W.2d 331, 337 (Minn.1978).

¶ 19 The structure of economic development arrangements must change and grow over time to reflect and respond to increased commercial competition and complexities. An economic development plan, in

---

4. Section 17 of article X of the Oklahoma Constitution provides:

The Legislature shall not authorize any county or subdivision thereof, city, town, or incorporated district, to become a stockholder in any company, association, or corporation, or to obtain or appropriate money for, or levy any tax for, or to loan its credit to any corporation, association, or individual.

whatever form it takes, will be upheld so long as it serves a public purpose and otherwise meets constitutional requirements.

¶ 20 By passage of Resolution 214, the Warr Acres City Council determined that the proposed economic development plan would promote a legitimate public purpose by increasing sales tax revenues for the City of Warr Acres, adding new jobs, retaining existing jobs, and promoting collateral economic growth and development. The essential question presented to this Court, as well as to the trial court, is not whether the details of the plan match those in *Burkhardt*, but rather whether the plan served a legitimate public purpose. It is not for the courts to second guess the wisdom of the City Council in agreeing to the details of the plan. This Court need not agree that it was the best arrangement or even a good arrangement. If the economic development plan served a legitimate public purpose of promoting the general welfare, economic security, and prosperity of the City of Warr Acres and its citizens, then it withstands constitutional challenge.

¶ 21 The general welfare, economic stability, and prosperity of the City of Warr Acres and its citizens have been served and will continue to be served by the relocation of a large retail facility to within the corporate limits where it has generated approximately $650,000.00 annually in sales tax revenues. These revenues have allowed the City to expand the type and scope of services allowed to all citizens of the community, including enhanced public improvements, police protection recreational facilities and the like. The economic development plan does not violate section 14 or section 17 of article 10 of the Oklahoma Constitution.

## II. Prohibition on Deficit Spending

¶ 22 Article 10, section 26 of the Oklahoma Constitution provides:

Except as herein otherwise provided, no county, city, township, school district or other political corporation, or subdivision of the state, shall be allowed to become indebted in any manner, or for any purpose, to an amount exceeding, in any year, the income and revenue provided for such year without the assent of three-fifths of the voters thereof. . . .

The purpose of this provision "is to force cities and municipalities to operate on a cash basis, and to prevent indebtedness extending beyond one year." *Del City v. FOP, Lodge No. 114*, 869 P.2d 309, 311 (Okla.1993). The question, therefore, is whether the economic development plan obligated the City of Warr Acres to incur a financial obligation after the year 1992 to be paid from taxes levied and collected in subsequent fiscal years. It did not.

¶ 23 The City's sole financial obligation under the plan was the purchase of the United States Strip Security which was placed in escrow. The City fulfilled this obligation during the same fiscal year in which the obligation arose. Therefore, the economic development plan complied with article 10, section 26.

## Conclusion

¶ 24 The City of Warr Acres structured an economic development plan which successfully induced the nation's largest retailer to build a large store on an undeveloped site within its corporate limits. The City's purchase of the United States Strip Security has annually yielded more than its purchase price in sales tax revenues.

¶ 25 The plan followed the legal guideposts articulated by this Court in *Burkhardt*. It meets the public purpose requirement, of article 10, of sections 14 and 17 of the Oklahoma Constitution. It does not violate the constitutional prohibition on deficit spending found in section 26 of article 10. The trial court did not err in so holding.

AFFIRMED.

¶ 26 KAUGER, C.J., SUMMERS, V.C.J., and HODGES, HARGRAVE and WATT, JJ., concur.

¶ 27 ALMA WILSON, J., concurs in part; dissents in part.

¶ 28 LAVENDER and SIMMS, JJ., dissent.

¶ 29 OPALA, J., disqualified.

KAUGER, Chief Justice, with whom SUMMERS, V.C.J. and WATT, J., join concurring:

¶1 It has been over eight years since we addressed the question of whether a city's economic development plan serves a legitimate public purpose for which public funds may be expended.[1] This case offers a contemporary opportunity to construe the public purpose requirements of the Okla. Const. art. 10, §§ 14, 17.[2] Whether a sufficient public purpose exists behind a city's expenditure of a public money for an economic development plan should be measured by contemporary economic challenges faced by municipalities.[3] Today's competitive economic environment may require that a city facilitate public and private cooperation to simulate and stabilize the locality's economy.

¶2 The City's expenditure was appropriated out of its general budget. Consequently, if the expenditure results in a public use or purpose, it is not prohibited by §§ 14 and 17 of art. 10.[4] The term "public purpose" as used in § 14, art. 10 is not to be construed in a narrow and restricted sense.[5] Although the term public purpose is incapable of exact definition, it is a fluid concept which should be broadly construed to comport with new developments and with changing conditions of the time.[6]

¶3 The Oklahoma Constitution authorizes the expenditures of public funds for economic development.[7] While there have been few, recent occasions to construe the specific limitations imposed by the Okla. Const. art. 10, §§ 14, 17,[8] it is deeply rooted

1. *Burkhardt v. City of Enid,* 1989 OK 45, 771 P.2d 608, 611–612.

2. The Okla. Const. art. 10, § 14 provides:

   "Taxes shall be levied and collected by general laws, and for public purposes only, except that taxes may be levied when necessary to carry into effect Section thirty one of the Bill of Rights. Except as required by the Enabling Act, the State shall not assume the debt of any, county, municipal corporation, or political subdivision of the State, unless such debt shall have been contracted to defend itself in time of war, to repel invasion, or to suppress insurrection."

   The Okla. Const. art. 10, § 17 provides:
   "The Legislature shall not authorize any county or subdivision thereof, city, town, or incorporated district, to become a stockholder in any company, association, or corporation, or to obtain or appropriate money for, or levy any tax for, or to loan its credit to any corporation, association, or individual."

3. *R.E. Short Co. v. City of Minneapolis,* 269 N.W.2d 331, 337 (Minn.1978); *State ex rel. Hammermill Paper Co. v. LaPlante,* 58 Wis.2d 32, 205 N.W.2d 784, 797 (1973); *City of Glendale v. White,* 67 Ariz. 231, 194 P.2d 435, 438 (1948).

4. Okla. Const. art. 10, § 14, see note 2, supra. Okla. Const. art. 10, § 17, see note 2, supra. *Willow Wind, Inc. v. City of Midwest City,* 1989 OK 171, 790 P.2d 1067, 1070; *Sublett v. City of Tulsa,* 1965 OK 78, 405 P.2d 185, 197; *Lawrence v. Schellstede,* 1960 OK 10, 348 P.2d 1078, 1080.

5. *Burkhardt v. City of Enid,* supra, note 1 at 610; *Way v. Grand Lake Association, Inc.,* 635 P.2d 1010, 1015 (Okla.1981); *Helm v. Childers,* 181 Okla. 535, 75 P.2d 398, 399 (1938).

6. *R.E. Short Company v. City of Minneapolis,* see note 3, supra; *State ex rel. Hammermill Paper Co. v. Plante,* see note 3, supra; *City of Glendale v. White,* see note 3, supra.

7. The Okla. Const. Art. 10, § 35(a) provides:

   "Any incorporated town and any county may issue, by and with the consent of the majority of the registered voters of said municipality or county voting on the question at an election held for the purpose, bonds in sums provided by such majority at such election for the purpose of securing and developing industry within or near the said municipality or county holding the election."

   The Okla. Const. art 10, § 15(b) provides in pertinent part:
   "... Pursuant to authority of and subject to requirements of law and according to professional norms established nationally in similar activities, the Oklahoma Center for the Advancement of Science and Technology or its successor may be authorized to use public funds in order to promote economic development by purchase or ownership of stock or to make investments in private enterprises ..."
   See also, the Okla. Const. art. 10, § 42 (authorizing the Oklahoma Development Finance Authority to issue bonds to provide an economic development credit enhancement reserve fund).

8. See, e.g., *Burkhardt v. City of Enid,* note 1, supra (expenditure of public funds to acquire private university campus and lease it back to university); *Way v. Grand Lake Association, Inc.,* see note 5, supra (expenditures to public and/or private multicounty organizations in cooperation with attracting tourism and recreation to state); *Sublett v. City of Tulsa,* supra, note 4 at 194–195 (development and improvement of harbors and ports notwithstanding that parts are leased for

in Oklahoma law that economic development is a legitimate public purpose for which public funds may be expended.[9] We most recently addressed the public purpose requirements of the Okla. Const. art. 10, §§ 14 and 17, in *Burkhardt v. City of Enid*, 1989 OK 45, 771 P.2d 608, 611–612, where we held that a city ordinance providing for the expenditure of public funds to acquire a private university's campus and lease it back to the university for a sum below market rate did not violate §§ 14 and 17, of art. 10. In doing so, the Court focused on two principles to determine whether the municipal plan was constitutional: 1) whether the activity benefitted the public, as opposed to special interests or persons; and 2) whether consideration was given.

¶ 4 Other courts construing public purpose requirements have applied similar tests to determine if an economic development plan was permissible. For example, in *Maready v. City of Winston–Salem*, 342 N.C. 708, 467 S.E.2d 615, 620 (1996), the Supreme Court of North Carolina, faced with the question of whether the development plans of local governments authorized by statute to make economic development incentive grants to private corporations constituted a valid public purpose examined: 1) whether the public benefits were in common and not for particular persons, interests, or estates; and 2) whether the ultimate net gain or advantage must be in the public's interest rather than that of an individual or private entity. The Supreme Court of New Jersey, in *Roe v. Kervick*, 42 N.J. 191, 199 A.2d 834, 841 (1964), when determining the constitutionality of a redevelopment act which facilitated development of certain economically depressed areas, inquired into the object sought to be accomplished and the degree and manner in which it affects public welfare. In *Rice v. Ashcroft*, 831 S.W.2d 206, 209–210

(Mo.App.1991), the court, reviewing an agreement to lease a new stadium from the regional sports authority, decided that if the primary effect of the public expenditure was to serve a public municipal purpose rather than to promote some private end, the expenditure was legal.

¶ 5 Determinative of whether a city's economic development plan is constitutional are the several different principles which were the focus of *Burkhardt* and these cases. Several different factors should be considered before deciding whether the expenditure meets the public purpose requirements of the Oklahoma Constitution:

1) the way in which the public benefits compare to the way in which private parties may benefit;

2) the overall primary effect of the public expenditure;

3) the consideration given for the expenditure;

4) the location or site improvement of a particular project;

5) the creation of employment opportunities;

6) the comparison of private dollars involved in a project to the number of public dollars;

7) increased tax and/or other revenues; and

8) competition with other localities.[10]

¶ 6 Here, applying these factors, Warr Acres' economic development plan benefits the public in many direct and indirect ways. The record reflects that sales revenues were projected to be over $400,000.00 annually, but in actuality the relocation of the Wal–Mart increased the sales tax revenues by $650,000.00 annually. It is readily apparent that additional employment opportunities arose within Warr Acres with the addition of

use of private persons or corporations); *Lawrence v. Schellstede*, supra, note 4 at 1081 (city's membership in mutual insurance company).

**9.** *Burkhardt v. City of Enid*, see note 1, supra; *Way v. Grand Lake Association, Inc.*, see note 5, supra; *In re Southern Oklahoma Development Trust*, 1970 OK 118, 470 P.2d 572, 574–575; *Sublett v. City of Tulsa*, supra, note 4 at 194–195; *Lawrence v. Schellstede*, supra, note 4 at 1081.

**10.** *Burkhardt v. City of Enid*, see note 1, supra; *Maready v. City of Winston–Salem*, 342 N.C. 708, 467 S.E.2d 615, 620 (1996); *Roe v. Kervick*, 42 N.J. 191, 199 A.2d 834, 841 (1964); *Rice v. Ashcroft*, 831 S.W.2d 206, 209–210 (Mo.App. 1991); See also, Gold, *Economic Development Projects: A Perspective*, 19 Urb. Law. 193 (1987) for other factors which may also be considered when undertaking an economic development project.

such a large retail facility, and that the tax base for the public school system expanded. Locating the new Wal–Mart on an otherwise vacant lot, undoubtedly stimulated other business growth within the locality's limits as well.

¶ 7 The public expenditure appears to be relatively low, when it is compared to the retailer's costs of building a facility and leasing the land for 20 years. This plan gave Warr Acres a method of competing with neighboring cities to attract economic opportunities and jobs within its locality. The increased revenues also allow the City to enhance and increase the services it provides to its citizens. These factors reflect that the City obtained consideration for its expenditure because it gained specific economic benefits for its investment, and it retained the ability to recoup its investment in the event a retail business did not lease the land beyond the primary term of the lease.

¶ 8 Nothing in the record shows that any member of the City Council personally benefitted from the plan, or that any one of its members was motivated by a personal interest in approving the plan. Although the retailer and private property owners benefitted from the plan, these benefits are incidental compared to all of the public benefits. It clearly appears that the primary object of Warr Acres' expenditure was to serve a public municipal purpose. Accordingly, the plan meets the two primary principles set forth in *Burkhardt v. City of Enid,* 1989 OK 45, 771 P.2d 608, 611–612, withstanding constitutional scrutiny.

¶ 9 Municipalities today compete on a nation-wide level to attract new industry into their locality. A city cannot compete with other cities or even other states if other cities and states are competing with inducements devised under contemporary economic development plans like Warr Acres'. This has been recognized in other states, as courts have construed public purpose requirements for the expenditure of public funds to encompass ever changing public needs and adapt to the ever increasing competition for industry development. Economic development plans devised to provide gainful employment, improve living conditions, attract industry and advance the economy, like the plan at issue here, in which the public benefits greatly outweigh the incidental benefit to a private person or corporation have been upheld. *Dworman v. Mayor & Board of Aldermen Governing Body of Town of Morristown,* 370 F.Supp. 1056, 1072 (D.N.J.1974) (city's agreement to build parking garage under shopping mall upheld because it replaced an economically depressed area with an active business, created new jobs, and provided substantial additional tax revenues for the town); *Maready v. City of Winston–Salem,* 342 N.C. 708, 467 S.E.2d 615, 627 (1996) (local governments authorized by statute to make economic development incentive grants to private corporations upheld as a valid public purpose); *Witcher v. Canon City,* 716 P.2d 445, 454–455 (Colo. 1986) (city's amendment to lease with private company in which city agreed to reduce share of bridge tolls served a valid public purpose); *Wolper v. City Council of the City of Charleston,* 287 S.C. 209, 336 S.E.2d 871, 875 (1985) (tax increment financing law authorizing cities to incur indebtedness to revitalize blighted and deteriorating areas were public purpose even though private individuals incidently benefitted); *R.E. Short Co. v. City of Minneapolis,* 269 N.W.2d 331, 339 (Minn.1978) (city's construction of parking facility to induce developer to construct hotel and trade mart complex was permissible); *State* ex rel. *Hammermill Paper Co. v. LaPlante,* 58 Wis.2d 32, 205 N.W.2d 784, 799 (1973) (statue authorizing municipalities to issue revenue bonds to finance industrial projects was valid because development of projects would place state on competitive basis with neighboring states); *Dennis v. City of Raleigh,* 253 N.C. 400, 116 S.E.2d 923, 926 (1960) (city may pay, from available surplus funds which were not derived from taxes, a private corporation for advertising advantages of city in effort to secure location of new industry within city); *City of Glendale v. White,* 67 Ariz. 231, 194 P.2d 435, 441 (1948) (expenditure of funds for city to pay dues in private municipal league was sufficient public purpose); *Rice v. Ashcroft,* 831 S.W.2d 206, 209–210 (Mo.App.1991) (agreement to lease new stadium from regional sports authority upheld because the primary

effects benefitted the public); *Marshall Field & Co. v. Village of South Barrington,* 92 Ill.App.3d 360, 47 Ill.Dec. 964, 968–69, 415 N.E.2d 1277, 1281–1282 (1981) (issuance of revenue bonds to finance construction of retail facilities served public purpose because courts look to the goals sought by and the actual effects of the expenditure of the public funds in deciding the issue). These cases are just a few of the prime examples of the variety of cases which reflect a trend toward broadening the scope of what constitutes a valid public purpose which permits a city's expenditure of public revenues.

¶ 10 The sufficiency of a public purpose behind a municipalities' economic development plan should be measured by considering primarily the goal and effect of the plan, as well as the public benefit of the plan compared to any private or individual benefits, the consideration given for the expenditure of public funds, the location or site improvement of a particular project, the creation of employment opportunities, the comparison of private dollars involved in a project to the number of public dollars, increased tax and/or other revenues, and competition with other localities. Under these factors, the economic development plan used by the City of Warr Acres is constitutional.