2004 OK 26

**In the Matter of the Application of the OKLAHOMA DEVELOPMENT FINANCE AUTHORITY for Approval of Industrial Development Taxable Revenue Bonds for the Benefit of the Goodyear Tire & Rubber Company and Michelin North America, Inc.**

**No. 99,745.**

Supreme Court of Oklahoma.

April 6, 2004.

As Corrected May 3, 2004.

---

Gary M. Bush, Fagin, Brown, Bush, Tinney & Kiser, Lynn C. Rogers, Assistant Attorney General, Earl Skarky, Crowe & Dunlevy, Oklahoma City, OK, for Applicant Oklahoma Development Finance Authority.

Jerry R. Fent, Oklahoma City, OK, Pro Se Respondent.

## HARGRAVE, J.

¶ 1 The Oklahoma Development Finance Authority ("ODFA") has filed an application pursuant to 20 O.S. § 14.1 [1] asking this Court to assume original jurisdiction and approve industrial development taxable revenue bonds to be issued pursuant to the Oklahoma Quality Jobs Incentive Leverage Act, 68 O.S. Supp.2002 § 3651 et seq. The purpose of the bonds is to provide funds to pay or reimburse The Goodyear Tire & Rubber Company and Michelin North America, Inc. for a portion of the costs of expanding and re-tooling their existing manufacturing plants in Oklahoma. The ODFA has authorized the issuance of Industrial Development Taxable Revenue Bonds (Goodyear Project) Series 2003 in a principal amount not to exceed $36,720,000 and Industrial Development Taxable Revenue Bonds (Michelin Project) Series 2003 in a principal amount not to exceed $29,615,000.

¶ 2 Section 3653 of the Oklahoma Quality Jobs Incentive Leverage Act (the Act), 68 O.S. Supp.2002 § 3651, et. seq., defines a qualifying establishment as a business: that has at least $115,000,000.00 in annual gross compensation paid with respect to jobs located in Oklahoma; that has an average salary of at least $40,000 paid annually to employees; that intends to add substantial gross compensation with respect to full-time-equivalent employment located in Oklahoma within three years of filing an irrevocable election with the Oklahoma Department of Commerce as provided in the Act; that has at least $200,000,000.00 total investment in Oklahoma; that intends to add investment for modernization and retooling of a facility located in the state of at least $50,000,000.00, within five years of filing an irrevocable election with the Oklahoma Department of Commerce as provided in the Act; that has and maintains at least 1,550 full-time employees in the state; that is described by Industry

---

1. 20 O.S.2001 § 14.1 provides that any department, institution, bureau, division, commission, agency, trusteeship, or authority of state government authorized to issue bonds, notes or other evidences of indebtedness, may, upon advice of bond counsel or upon governing board approval, file an application with this Court for the approval of any obligations to be issued by it. Title 20 O.S. § 14.2, cited in the application, was repealed by Laws 2002, ch. 481 § 4.

Number 3011, Industry Group Number 301, Major Group, 30 of the Standard Industrial Classification Manual (SIC) latest revision; and that qualifies for proceeds under the Act and as of the date the irrevocable election is filed, has received or will receive funds as a result of a voter-approved economic development incentive derived from a tax levy as described in the definition. Two manufacturers have qualified under the Act, to date: The Goodyear Tire & Rubber Company and Michelin North America, Inc. (referred to herein as "Goodyear" and "Michelin", or collectively as "qualifying establishments").

¶3 Section 3652 of the Act states the legislative purpose behind its enactment:

"The Legislature finds that certain establishments which qualify for incentive payments pursuant to the Oklahoma Quality Jobs Program Act [68 O.S. § 3601 et seq.] are a source of economic benefits for the state, its political subdivisions and its residents that can only be achieved through the use of specialized economic incentives. The Oklahoma Quality Jobs Incentive Leverage Act is enacted in order to provide a mechanism for the leverage of incentive payments for the purpose of promoting and sustaining economic growth and activity within the State of Oklahoma. The Legislature finds that the use of the incentive payment, together with other fiscal resources, is a method that provides a beneficial correlation between the use of monies in the quality Jobs Program Incentive Leverage Fund and the total economic benefits to be derived from the use of proceeds from the sale of obligations provided by Section 4 of this Act. [68 O.S. Supp.2002 § 3654]."

¶4 The Act directs the ODFA to issue obligations in a principal amount determined as required by the section, upon certification by the Oklahoma Department of Commerce that an establishment has filed the irrevocable election described in the Act.[2] The Act provides that no obligation issued by the ODFA pursuant to the Act shall be considered a general obligation of the State of Oklahoma for any purpose, and the indebtedness incurred shall be a debt of the ODFA and not a debt of the State of Oklahoma. 68 O.S. Supp.2002 § 3654(A).

¶5 The Act goes on to provide that the total principal amount of the indebtedness incurred by the ODFA shall not be greater than an amount required for proceeds equal to 14.4% of the maximum amount of projected investment for the facility of an establishment that will receive funds as a result of a voter-approved economic development incentive. 68 O.S. § 3654(B)(1). The voter-approved economic incentive is described in § 3653(1)(h).[3]

¶6 Michelin and Goodyear have shown evidence that each has or will receive the voter approved local economic development incentive. Michelin and Goodyear have filed the irrevocable election to forego the incentive payments that they are authorized to receive under the Oklahoma Quality Jobs Program Act, 68 O.S.2001 § 3601 et seq.[4] The irrevocable election means that the in-

2. The irrevocable election is described in 68 O.S. Supp.2002 § 3658(A). It provides that an establishment that is authorized to receive incentive payments under the Oklahoma Quality Jobs Program Act, 68 O.S. 3601 et seq., shall, as a condition of being eligible to use the proceeds from the sale of the bonds, file an irrevocable election with the Oklahoma Department of Commerce to have such incentive payments, which otherwise would be paid to the establishment, transferred to the Quality Jobs Program Incentive Leverage Fund to be used for repayment of the bonds.

3. Section 3653(1)(h) requires a qualifying establishment to show that it has received or will receive funds as a result of a voter-approved economic development incentive derived from a tax levy, with projected revenues for the county or municipality during the period of the tax levy equal to or greater than five million dollars, as certified by the establishment to the Oklahoma

Department of Commerce, and an amount committed for the direct benefit of the establishment equal to or greater than 13.5% of the proceeds from the obligations issued pursuant to the Act.

4. Section 3604 of the Oklahoma Quality Jobs Program Act provides that a qualified establishment under that act may receive quarterly incentive payments for a ten-year period from the Oklahoma Tax Commission in an amount equal to the net benefit rate multiplied by the actual gross payroll of new direct jobs for a calendar quarter as verified by the Oklahoma Employment Security Commission. The liability of the State of Oklahoma to make the incentive payments under the act is limited to the balance contained in the Quality Jobs Program Incentive Payment Fund created by § 3605 of the Oklahoma Quality Jobs Program Act. That section directs the Oklahoma Tax Commission to withhold a portion of the income taxes levied and collected under 68

centive payments that otherwise would have been paid to Michelin and Goodyear under the Oklahoma Quality Jobs Program Act will instead be deposited in the Quality Jobs Program Incentive Leverage Fund. 68 O.S. § 3658(B). That section specifically provides that such incentive payments shall be treated as an asset of the qualifying establishment that has been paid to the State of Oklahoma for purposes of the Act. In addition, 68 O.S. Supp.2002 § 3658(F), (H) and (I) prohibit the qualifying establishments from claiming certain tax credits or exemptions that otherwise would be available to them.[5]

¶ 7 Applicant states that the bonds are self-liquidating revenue bonds, payable solely from funds transferred from other sources to the ODFA. Section 3657 of the Act creates a special fund within the State Treasury to be designated the "Quality Jobs Program Incentive Leverage Fund" (the Fund), and all amounts deposited into the Fund shall be used by ODFA solely as authorized by the Act, including payment of principal, interest and other costs associated with the issuance of the bonds under the Act. The ODFA is to maintain separate accounts within the Quality Jobs Program Incentive Leverage Fund for each qualifying establishment, and to provide for the deposit therein of the incentive payments and withholding taxes apportioned to the fund by the Act.

¶ 8 The bonds are secured first by transfers to the Fund of the incentive payments under the Oklahoma Quality Jobs Program Act that Michelin and Goodyear have elected to forego. The second level of security for payment of the bonds consists of transfers of withholding taxes attributable to a qualifying establishment, as provided in sections 3658(E) and 3659 of the Act. Those two sections provide that for each fiscal year during which any obligations issued by the ODFA under the Act remain unpaid, the Oklahoma Tax Commission is directed to compute the amount of withholding taxes attributable to employees of the qualifying establishment whose wages are subject to the levy, and transfer to the Fund an amount of withholding taxes required to equal the difference between the incentive payment deposit and the amount to be certified by the ODFA not later than January 1 and July 1 of each year that will be necessary for payment of principal interest and other costs for the succeeding six-month period.

¶ 9 Section 11 of the Act (Laws 2002, ch. 299 § 11) is not codified; it provides that if there are modifications to the income tax laws of the State of Oklahoma resulting in a significant decline in the amount of withholding taxes attributable to the wages of employees of a qualifying establishment, the Legislature declares its intent to direct such revenues into the Fund as may be required in order for the ODFA to repay the obligations issued pursuant to the Act.

¶ 10 Michelin and Goodyear are required to execute Guaranty Agreements that provide that they will pay if the incentive leverage payments and withholding taxes are inadequate. 68 O.S. Supp.2002 § 3654(M) [6].

---

O.S. § 2355 for deposit to the fund according to the formula set out therein.

5. Section § 3658(F) provides:
   "an establishment to which proceeds from the sale of any obligations issued by the Oklahoma Development Finance Authority are made available as provided by this act shall not claim any tax credits that would otherwise be authorized pursuant to Section 2357.4 of Title 68 of the Oklahoma Statutes as a result of jobs created or capital investment made as a direct result of the use of such bond proceeds...."
   § 3658(H) provides:
   "an establishment that files an irrevocable election authorized by this section and to which any proceeds from the sale of obligations authorized by Section 4 of this act are paid or made available shall not be eligible to claim any exemption pursuant to Section 6B of Article X of the Oklahoma Constitution, or Section 2902 of Title 68 of the Oklahoma Stat-

utes with respect to real or personal property constituting the facility ...."
   § 3658(I) provides:
   "an establishment that files an irrevocable election authorized by this section and to which any proceeds from the sale of obligations authorized by Section 4 of this act are paid or made available shall not be eligible to claim any exemption otherwise available pursuant to Section 1359 of Title 68 of the Oklahoma Statutes with respect to the facility constructed, acquired, improved or equipped with such proceeds ..."

6. Section 3654(M) provides, in pertinent part:
   "An establishment that otherwise qualifies for the use of proceeds derived from the sale of obligations pursuant to subsection A of this section shall execute and deliver to the ODFA a guaranty .... for the benefit of the Oklahoma Development Finance Authority in the event of a

Section 3660 of the Act provides that if the establishment should cease to qualify for an incentive payment and if the withholding tax collections from the establishment are not sufficient to make required payments of principal and interest, it shall be liable to the ODFA for the amount of any required principal or interest payment.

¶ 11 If the other security levels are inadequate to pay debt service on the bonds, the bonds will be payable from income tax revenues allocated to the Fund as provided in 68 O.S. Supp.2002 § 2352(E).[7] That section applies to revenue derived from the income tax imposed on corporations pursuant to 68 O.S. § 2355(C) and (D). No revenues authorized under section 2352 shall be transferred to the Fund until the guaranty terms have been invoked and payment received, or in the event of default under the guaranty. 68 O.S. § 3654(M).

¶ 12 No other security will be pledged, and, according to the ODFA, no third-party bond insurance or credit will be pledged to the payment of the bonds. The bonds will have fixed rates of interest for the maturing amounts, with a final maturity not to exceed twenty (20) years from date of issue.

¶ 13 The Authority sought and received approval by the Council of Bond Oversight as required by 62 O.S.2001 § 695.9. Jerry R. Fent, a resident taxpayer of the State of Oklahoma, has filed a protest to issuance of the bonds. At the outset, he objects to the Council of Bond Oversight as violating the separation of powers doctrine and hence unable to approve the bonds. The constitutionality of the Council of Bond Oversight was

recently upheld in *In the Matter of the Application of the Okla. Dept. of Transp.,* 2003 OK 105 ¶ 16, 82 P.3d 1000, and we need not address the issue again.

¶ 14 Protester Fent's objections fall into three main areas: 1) the bonds are not for a public purpose and they fall within prohibitions against granting exclusive rights or privileges to private corporations; 2) the employee withholding taxes are "trust funds" that cannot be used for other purposes and 3) the bonds are not "revenue bonds" and therefore they create a debt against the State of Oklahoma.

¶ 15 We would reiterate that a heavy burden is placed on those challenging a legislative enactment, and every presumption is to be indulged in favor of the constitutionality of a statute. *Application of Oklahoma Capitol Improvement Authority,* 1998 OK 25, 958 P.2d 759, 763, *cert. den.,* 525 U.S. 874, 119 S.Ct. 174, 142 L.Ed.2d 142. If two possible interpretations of a statute are possible, only one of which would render it unconstitutional, a court is bound to give the statute an interpretation that will render it constitutional unless constitutional infirmity is shown beyond a reasonable doubt. *Fent v. Oklahoma Capitol Improvement Authority,* 1999 OK 64, 984 P.2d 200, 204.

## I.

## BONDS AUTHORIZED FOR VALID PUBLIC PURPOSE WITHIN THE MEANING OF OKLA. CONST. ART.

deficit between the sum of the incentive payment and the withholding taxes transferred to the Quality Jobs Program Incentive Leverage Fund pursuant to Section 9 of this act and the total amount required for the payment of principal, interest or other costs associated with the obligations ... Payments received ... pursuant to the .... terms of the guaranty shall be deposited into the Quality Jobs Program Incentive Leverage fund.... The ... Authority shall require that the guaranty provide for such terms of payment as may be required to make payments of principal, interest or other costs in a timely manner to the entity or entities to which the Authority is obligated to make payment ..."

7. Section 2352(E) authorizes apportionment of corporate income tax revenue for the purpose of repayment of ODFA bonds issued under the Quality Jobs Program Incentive Leverage Act in the event that the other sources fail. It states that for any period of time as certified by the ODFA and the Oklahoma Department of Commerce to be necessary for the repayment of obligations issued by the ODFA if the other sources of revenue paid or apportioned to the Quality Jobs Program Incentive Leverage Fund are not adequate, including the guaranty required by subsection M of Section 4 of the Act, an amount certified by the ODFA to the OTC shall be apportioned to the Quality Jobs Program Incentive Leverage Fund before any other apportionments

10 § 14,[8] AND THE USE OF BOND PROCEEDS IS NOT A GIFT OR SPECIAL PRIVILEGE IN VIOLATION OF OKLA CONST., ART. 10, § 15[9] OR ART. 5, § 51[10]

¶ 16 Protester argues that the proposed bond issue violates: Okla. Const., art. 10 § 14, which provides that taxes shall be levied and collected by general laws, and for public purposes only; art. 5 § 51, which prohibits the state from granting any corporation an exclusive right, privilege or immunity; and art. 10 § 15 which restricts a pledge or loan of credit to a corporation.[11]

■ ¶ 17 Encouragement and promotion of commerce and industry in the state is an authorized function of the State of Oklahoma. We addressed the "public purpose" requirement in *Shipp v. Southeastern Oklahoma Industries Auth.*, 498 P.2d 1395 (1972). *Shipp* involved the Southeastern Oklahoma Industries Authority, a public trust created under 60 O.S. § 176. The Authority desired to issue bonds to construct sewer facilities and pollution control devices and the bonds were challenged on the grounds that pollution prevention was not a function that the city was authorized to do, nor one that was specifically authorized by the trust documents. After observing that the State of Oklahoma was the beneficiary of the trust, we said:

"The State of Oklahoma, in performing its basic purposes and functions is invested with the authority to promote and encourage the development of industry and commerce within the state, and to further industrial, manufacturing, cultural, medical and/or educational activities within the state. Doing so are "authorized functions" of the State of Oklahoma." *Shipp* at 1399.

¶ 18 In *State ex rel. Brown v. City of Warr Acres*, 1997 OK 117, 946 P.2d 1140, a *qui tam* action, we heard a challenge to the city's expenditure of public fund to induce a private land trust to lease land to a retailer. We held that the expenditure of public funds met the public purpose requirements of Okla. Const., art. 10, §§ 14 and 17. We said that an economic development plan, in whatever form it takes, will be upheld so long as it serves a public purpose and otherwise meets constitutional requirements. *Warr Acres* at 1144–45. We said:

Courts are to give great deference to a legislative body's determination that a particular project will serve a public purpose. In reviewing that determination, courts cannot interfere to arrest legislative action where the line of distinction between that allowable and that which is not is faint and shadowy. [citation omitted]. Such a determination should be reversed only upon a clear showing that it was manifestly arbitrary, capricious, or unreasonable. [citation omitted]. *Warr Acres* at 1144.

¶ 19 In *Burkhardt v. City of Enid*, 1989 OK 45, 771 P.2d 608, 610, we stated that the term "public purpose" in relation to art. 10, § 14, should not be construed in a narrow or restrictive sense. We noted that for taxation purposes, public use requires that the work shall be essentially public and for the general good of all the inhabitants of the taxing body. *Id.* We went on to say that a public purpose affects the inhabitants of the state or taxing district as a community and not merely as individuals. *Burkhardt* at 611. In that case, the City of Enid desired to purchase Phillips University, a private college, which it would lease back to the university to prevent its closure. Voters had narrowly approved a

---

are made as otherwise authorized by the paragraph.

8. Okla. Const., art. 10 § 14 provides, in pertinent part:

A. Except as otherwise provided by this section, taxes shall be levied and collected by general laws and for public purposes only. . . .

9. Okla. Const., art. 10 § 15 provides, in pertinent part:

Except as provided by this section, the credit of the State shall not be given, pledged, or loaned to any individual, company, corporation, or asso-

ciation . . . nor shall the State become an owner or stockholder in, nor make donation . . . to any company, association or corporation.

10. Okla. Const., art. 5, § 51 provides that the Legislature shall pass no law granting to any association, corporation, or individual any exclusive rights, privileges, or immunities within this State.

11. Protester Fent's does not contest the transfer of the incentive payments under The Oklahoma Quality Jobs Program Act; his protest is directed toward the transfer of employee income taxes withheld, which is discussed in Part II hereof.

sales tax to accomplish the purchase by the City. In discussing the benefits of a university to the public, we listed many factors that are analogous to the benefits to the communities in which the Goodyear and Michelin plants are located. We said that the citizens of Enid will receive many benefits both directly and indirectly: the plan would directly benefit Enid's economy by the preservation of hundreds of jobs at the university and by the continued presence of students who spend money in Enid. The scholarship fund would enable more area students to attend a local university. The presence of the university would undoubtedly have a significant effect on the city's ability to attract new industry and new jobs. Finally, we said, Enid would continue to enjoy the social, education and cultural benefits that flow from near access to higher educational opportunities. The overwhelming benefits to the community of Enid, we said, brought the plan within the definition of public purpose.

■ ¶ 20 Protester Fent asserts that the bonds violate Okla. Const., art. 10 § 15 and art. 5 § 51, which provide that the credit of the State shall not be given, pledged or loaned to any corporation and that the legislature shall pass no law granting any exclusive rights or privileges to any corporation. etc. Fent cites no cases in support of the art. 5 § 51 assertion, but we would note that the inhibition against special privileges and immunities contained in that section was intended to preserve equality between citizens who are similarly situated. *Kimery v. Public Service Co. of Okla.*, 1980 OK 187, 622 P.2d 1066, 1071 An example of an art. § 51 violation was. given in *Childers v. West Pub. Co.*, 1945 OK 85, 195 Okla. 220, 156 P.2d 809, discussing *Guthrie Daily Leader v. Cameron*, 3 Okla. 677, 41 P. 635, by a law that required that all printing, binding, stationery, and all proclamations and notices that were to be paid for out of the territorial treasury must be purchased from the State Capital Printing Company. Art. 5 § 51 does not apply to the present case.

¶ 21 *Burkhardt v. City of Enid*, 1989 OK 45, 771 P.2d 608 considered the challenge that the proposed expenditure of public funds

was a "gift" or extension of credit to a private institution. We found that the public benefits to the community of Enid constituted consideration to the city and refuted any argument that the plan was a gift or extension of credit to a private institution in violation of art. 10, § 17.[12] The challengers had argued that because the lease back to the university was below the market rate for commercial property in Enid, there was inadequate consideration and the transaction was therefore a gift or a loan. We said that this argument ignored the public benefits to the community of Enid and the obligations assumed by Phillips in the transaction. We said that consideration may be measured by benefit to one party or by forbearance, detriment, loss or responsibility assumed by the other part, citing *Sharp v. City of Guthrie*, 49 Okla. 213, 152 P. 403, 408 (1915). The lease payments were, we said, only one obligation assumed by Phillips in the lease arrangement; Phillips sold its assets to the city at less than market value and agreed to limitations on the use and control of the sale proceeds; Phillips may repurchase the campus, but only at fair market value, but not for less than the amount paid by the city plus the costs of bonds and other financing. These obligations, we said, provided adequate consideration to demonstrate the plan is not a gift or loan to Phillips, but rather a legitimate plan to further economic development by attracting industries to a city that provides higher education opportunities. *Burkhardt* at 611–612. The *Burkhardt* court contrasted *Veterans of Foreign Wars v. Childers*, 197 Okla. 331, 171 P.2d 618 (1946), which involved a direct appropriation by the legislature to the VFW, a private agency, that was free of any control or management by any officer or agency of the state.

■ ¶ 22 In *Children's Home & Welfare Ass. v. Childers*, 197 Okla. 243, 171 P.2d 613, 614 (1946), we defined a "gift" in violation of art. 10 § 15 as: "gratuitous transfers of property of the state voluntarily and without consideration." As discussed herein, the promotion of economic development is a legitimate state function and the benefits to be derived from economic development consti-

---

12. Article 10 § 17 is the version of art. 10 § 15 that applies to municipalities and the rationale of *Burkhardt was* applied to an analysis of art. 10

§ 15 in *Matter of Petition of University Hospitals Authority, 1997 OK 162, 953 P.2d 314, 320.*

tute adequate consideration to defeat assertions that economic incentives are in the nature of a "gift." *See, Burkhardt, supra.* In addition, section 15(b) of art. 10 specifically authorizes the use of public funds by the Oklahoma Center for the Advancement of Science and Technology "in order to promote economic development" as set out therein.

¶ 23 In conclusion, we said in *Burkhardt* that:

> Economic development is a public purpose for which a municipality may expend public funds. A municipality may spend public funds for economic development in concert with private actors provided that constitutional requirements are met. Although a municipality may be flexible in structuring its plans for economic development, it must obtain adequate consideration and accountability from a private actor in exchange for the expenditure of public funds. 771 P.2d at 614.

[redacted] ¶ 24 Applicant suggests that the thrust of the *Burkhardt* and *Warr Acres* opinions is whether the benefits to the state outweigh the costs of an economic development plan. They note that the Act in the case at bar provides direct savings to the state in the form of benefits foregone by Goodyear and Michelin, which are in excess of the amounts of the bond proceeds to be made available for the plant expansions. The certificate of the Secretary of Commerce estimates that Goodyear's election means that it will not receive $39,829,748 in benefits and that Michelin's election not to receive the benefits amounts to $35,813,948. Other benefits to the state are the retained jobs and new jobs, jobs created during construction, and incidental and related business that is generated by the plants and their expansions, resulting in stimulation of the economy of these two communities, as well as the state. The principal amount of the bonds, and therefore the indebtedness incurred by the ODFA, represents only 14.4% of the maximum amount of projected investment for each facility. The Act requires the qualifying establishment to provide evidence that each has or will receive the voter-approved local economic development incentive required by § 3654(B)(1) of the Act. To qualify, an establishment must intend to add substantial gross compensation within three years and it must provide documentation to the ODFA that a minimum of $50,000,000 has been expended or legally committed for a modernization and retooling of an existing facility located in the state before the ODFA is authorized to transfer proceeds to it. 68 O.S. Supp.2002 §§ 3653(1)(c) and 3654(H). The Act requires the manufacturers to execute Guaranty Agreements for the benefit of the ODFA. The Act requires adequate consideration and accountability from the qualifying establishments in exchange for the expenditure of public funds. *See, Burkhardt,* 771 P.2d at 614.

¶ 25 The protester has failed to meet the burden of showing that the proposed bond issue violates the public purpose requirement or that the sale of the bonds constitutes a gift or special privilege to Goodyear and Michelin.

## II.

## TRANSFER OF EMPLOYEE WITHHOLDING TAXES BY OKLAHOMA TAX COMMISSION TO THE QUALITY JOBS INCENTIVE LEVERAGE FUND IS NOT A TRANSFER OF TRUST FUNDS

[redacted] ¶ 26 The second tier of transfers to the ODFA to provide for repayment of the bonds consists of the Goodyear/Michelin employee withholding taxes to be transferred by the Oklahoma Tax Commission to the Quality Jobs Incentive Leverage Fund pursuant to 68 O.S. Supp.2002 § 3659.[13] Protester challenges this provision on the grounds that the

13. 68 O.S. Supp.2002 § 3659(B) provides:

"Beginning July 1, 2003, and for each fiscal year thereafter during which any obligations issued by the Oklahoma Development Finance Authority issued pursuant to Section 4 of this act remain unpaid, the Oklahoma Tax Commission shall transfer to the Quality Jobs Program Incentive Leverage Fund an amount of withholding taxes remitted by an establishment which has made the irrevocable election equal to the amount required pursuant to subsection E of [§ 3658] of this act."

68 O.S.2002 § 3659(E) provides:

"The amount of withholding taxes transferred to the Quality Jobs Program Incentive Leverage Fund pursuant to this section shall be deemed not to have accrued to the State Treasury for purposes of certifications required by the State Board of Equalization pursuant to

employee withholding taxes are "trust funds" to be held for the payment of possible refunds to those employees. Protester Fent argues that this violates Okla. Const., art. 10 § 19, which provides that taxes levied and collected for one purpose shall not be devoted to another purpose. Fent argues that the taxes withheld are trust funds that are to be used only for the submitted purpose and that employee withholding funds are subject to claims by the taxpayers for reimbursement. Allowing these funds to be transferred elsewhere means that other funds would have to be used to pay refund claims by these taxpayers. This argument implies that the employer's withholding is to be segregated, subject to claims being made for refunds to it's employees, which is not the case.

¶ 27 The income tax withholding provisions are set out at 68 O.S.2001 § 2385.1 et seq. Section 2385.3 [14] provides that every employer required to deduct and withhold taxes under section 2385.2 of title 68 shall pay over the amount so withheld to the Oklahoma Tax Commission (OTC), and shall file a return in such form as the OTC shall prescribe. Section 2385.3(D) provides that any sums so withheld shall be deemed held [by the employer] in trust for the State of Oklahoma and, as trustee, the employer shall have a fiduciary duty to the State of Oklahoma as to such sums. The duty of the employer, however, is to deduct the proper amount of taxes, pay them over to the Oklahoma Tax Commission and file a return. Once the employer has done that, it has done everything that it is required to do under the statute. The statute provides for penalties for the employer's failure to do so. Title 68 O.S.2001 § 2385.14 provides that all taxes deducted

and withheld by the employer shall be deemed and credited as payments on account of the tax levied on income for the taxable year.

¶ 28 Once transferred to the Oklahoma Tax Commission, the funds are under the exclusive control of the OTC and are deposited with the State Treasurer to be deposited in the Oklahoma Tax Commission's Official Depository Clearing Account. 68 O.S. 2001 § 2385.16. OTC is empowered and directed each month to transfer the amount that OTC estimates to be necessary to make tax refunds into a separate account, to be designated "Income Tax Withholding Refund Account" and to maintain a balance in the refund account sufficient to cover anticipated tax refunds. As to funds remaining in the Official Depository Clearing Account, the OTC is directed to make apportionments from such funds of the amount it considers available as income tax collection. *Id.* It is readily apparent that there is no suggestion or requirement that the withholdings from a particular employer shall be held in trust for the purpose of paying refunds to that employer's employees. Once transferred to OTC by the employer, the withheld employee taxes are under the complete control of the OTC and OTC decides which amounts are needed to cover anticipated tax refunds, and which amounts it considers available as income tax collection. Further, 68 O.S. Supp.2002 § 3659(E) [15] provides that the amount of withholding taxes transferred to the Quality Jobs Incentive Leverage Fund shall be deemed to be monies *held in trust for the benefit of the ODFA* in order to repay obligations issued by the ODFA under the Act.[16]

---

Section 23 of Article X of the Oklahoma Constitution and shall be deemed to be monies held in trust for the benefit of the Oklahoma Development Finance Authority in order to repay obligations issued by the Authority pursuant to Section 4 of this Act."

**14.** Amended, Laws 2002, ch. 460 § 40, deleting language not pertinent hereto.

**15.** See footnote 13.

**16.** Protester Fent also objects to § 3659(E) of the Act which provides that the amount of withholding taxes transferred to the quality Jobs Program Incentive Leverage Fund shall be deemed not to have accrued to the State Treasury for purposes of certifications required by the State Board of

Equalization pursuant to art. 10 § 23 of the Oklahoma Constitution. He has cited no cases in support of this proposition. As discussed above, the legislature has placed withholding taxes within the exclusive control of the Oklahoma Tax Commission. 68 O.S. § 2385.16. From the collected withholding, the OTC is empowered to determine the amounts needed for refunds and place it in a special account, and also to determine the amount available for distribution as income taxes collected. Section 3659(E) simply directs that the withholding taxes collected by OTC that are attributable to the qualifying establishment be transferred to the Quality Jobs Program Incentive Leverage Fund. *See, Application of Oklahoma Turnpike Authority,* 1960 OK 1, 348 P.2d 510, *infra,* wherein this Court upheld the

¶ 29 Protester Fent also asserts that taxes levied for one purpose shall not be used for another, citing Okla. Const., art. 10 § 19.[17] He argues that the employee withholding taxes are state income tax trust funds that are not being used for governmental purposes. He cites *Vette v. Childers*, 102 Okla. 140, 228 P. 145 (1924) for the proposition that under art. 10 § 19, no appropriation of funds in the state treasury can be made for other than a public purpose. That case states that under Okla. Const. art. 10 §§ 14 and 19, money in the state treasury can only be appropriated and used for public purposes, and in order to constitute a public purpose, the purpose must not only be affected with a public interest, but must be performed by the state in the exercise of its governmental functions. This is essentially the same "public purpose" argument raised by Fent in this case.

¶ 30 The stated purpose of the income tax is to "provide revenue for general governmental functions of state government." 68 O.S. Supp.2003 § 2352. As discussed in the preceding section, previous cases of this court have demonstrated that economic development is a legitimate purpose of state government. The *Shipp* case, supra, held that the State of Oklahoma, in performing its basic purposes and functions, is vested with authority to promote and encourage the development of industry and commerce within the state and to further industrial, manufacturing, cultural, medical and/or educational activities within the state. We said that these are "authorized functions" of the State of Oklahoma." *Shipp* at p. 1399.

¶ 31 In *City of Sand Springs v. Dept. of Public Welfare*, 1980 OK 36, 608 P.2d 1139, 1148, the use of sales tax revenues for the construction of a juvenile detention facility was challenged as an illegal use of earmarked funds in violation of art. 10 § 19.

After noting that the sales tax statute had been amended to include assistance to delinquent children, we looked to Okla. Const., art. 10 § 23, which gives the Legislature express authority to enact laws transferring existing revenues or surpluses from one fund to another.[18] We said that in light of the provision in art. 10 § 23, allowing transfer of existing funds without re-enactment of the tax-levying statute, it was necessary to conclude that art. 10 § 19 of the Constitution had been modified by such express authorization. We stated that the Constitution vests the whole matter of taxation exclusively within the power of the Legislature, as limited by the Constitution, and observed that the appropriation of moneys for the various state purposes rests in the sole discretion of the Legislature, limited only by the Constitution. Those limitations, we said, generally pertain to methods of levying and appropriating taxes and leaves the state purposes served by the use of such tax money largely to the unfettered discretion of the Legislature. *Id.* See also, *Calvey v. Daxon*, 2000 OK 17, 997 P.2d 164, 171–172.

¶ 32 The Court previously has approved bonds that were to be retired by apportionment of taxes to be placed in a special fund. See, *Application of Oklahoma Turnpike Authority*, 1960 OK 1, 348 P.2d 510, which approved the apportionment of that part of the tax collected from motor fuel consumption on the turnpikes of Oklahoma into a trust fund to be used as a guarantee for the payment of interest on turnpike bonds thereafter issued for the construction of additional turnpikes. In previous turnpike legislation, all money collected as tolls was placed in a general turnpike trust fund to be used to pay for construction and maintenance of the turnpike. The Oklahoma Turnpike Act of 1959 created a separate, segregated trust fund to be created by and contributed to by alloca-

apportionment of highway motor fuel taxes attributable to turnpike usage into a trust fund account to be used to guarantee payment of interest on turnpike bonds thereafter issued for the construction of additional turnpikes.

17. Article 10 § 19, Okla. Const. provides: "every Act enacted by the legislature that levies a tax shall specify the purpose for which the tax is levied and no tax levied for one purpose shall be used for another purpose."

18. Art. 10, § 23 provides, in pertinent part:

"... Provided, however that the Legislature may at any regular session or special session called for that purpose, enact laws to provide for additional revenues, other than ad valorem taxes, *or transferring the existing revenues or surpluses from one fund to another ...*" (emphasis added).

tion of a stated portion of the motor fuel tax collected on motor fuel consumed on all Oklahoma turnpike projects, with a limit on the aggregate amount of the allocations and with contingent use of the fund by the Turnpike Authority. We held that the apportionment of part of the tax from motor fuel consumed on the turnpikes into a trust fund, and the possible making of expenditures therefrom did not constitute an illegal use of such tax money, nor did such provision create a debt against the State of Oklahoma. 348 P.2d at 516. *See also, Application of Oklahoma Capitol Imp. Auth.,* 1998 OK 25, 958 P.2d 759, 764, where the funds came from pre-paid user fees and direct taxes dedicated specifically to the State Transportation Fund and earmarked for payment of highway bonds on an annual basis. Those taxes derived from direct taxes on motor fuels and other fuels, vehicle license and registration fees and apportionments levied under an environmentally-based indemnity fund. In addition, there was a newly-authorized revenue stream that dedicated Rainy Day Funds to fund highway improvements. *Id.*

¶ 33 Unless there is a specific constitutional prohibition, the Legislature has the right and responsibility to declare fiscal policy. *Fent v. Oklahoma Capitol Improvement Authority,* 1999 OK 64 ¶ 5, 984 P.2d 200, 204. The Legislature has determined that the use of incentive payments, and a mechanism for leveraging those payments, is a method of promoting economic benefits for the state, its political subdivisions and its residents. 68 O.S. Supp. § 3652. In *Fent,* we said:

> Simply, in ruling on the constitutional validity of a statute relating to this State's fiscal affairs, we are not allowed to consider whether it is based on sound economic

theory or whether it is the best means to achieve the desired result because such matters are for legislative determination. (citation omitted). *Id.*

¶ 34 We find that the apportionment of the employee withholding taxes under the Act does not violate Okla. Const., art. 10 § 19 and does not constitute a transfer of "trust funds" as alleged by the protester.

## III.

## BONDS NOT IN VIOLATION OF DEBT-LIMITATION PROVISIONS OF OKLA. CONST., ART. 10 §§ 23 AND 25[19]

¶ 35 In *Fent v. Oklahoma Capitol Improvement Authority,* 1999 OK 64, 984 P.2d 200, we determined that the bonds to be issued, along with the two statutes involved, did not violate Okla. Const., art. 10 §§ 23 and 25 because neither statute authorized state debt as contemplated by those constitutional balanced-budget provisions. We said that at most the statutes authorized only appropriation-risk or moral obligations bonds, and that under our previous cases, the issuance and sale of such bonds did not create a debt in a constitutional sense.

¶ 36 Likewise in *Application of Oklahoma Capitol Improvement Authority,* 1998 OK 25, 958 P.2d 759, we said that no constitutional debt was created where no legal obligation to pay beyond the current annual appropriation existed because future legislatures were not obligated to provide funding to retire the bonds.

■ ¶ 37 Protester Fent argues in the present case that the bonds are not revenue bonds because the state's withholding taxes are being used to pay off the bonds, in violation of Okla. Const. Article 10 §§ 23

19. Okla. Const., art. 10 § 23 provides, in pertinent part:

The state shall never create or authorize the creation of any debt or obligation, or fund or pay any deficit, against the state, or any department, institution or agency thereof, regardless of its form or the source of the money from which it is to be paid except as may be provided in this section and in Sections 24 and 25 of Article X of the Constitution of the State of Oklahoma.

Okla. Const., art. 10 § 25 provides, in pertinent part:

Except the debts specified in sections twenty-three and twenty-four of this article, no debts

shall be hereafter contracted by or on behalf of this State, unless such debt shall be authorized by law for some work or object, to be distinctly specified therein; and such law shall impose and provide for the collection of a direct annual tax to pay, and sufficient to pay, the interest on such debt as it falls due, and also to pay and discharge the principal of such debt within twenty-five years from the time of contracting thereof. No such law shall take effect until it shall, at a general election, have been submitted to the people and have received a majority of all the votes cast for and against it at such election. . . .

and 25, and that the employee withholding portion of the Act, § 3659(E) is illegal and unconstitutional as in violation of art. 10 § 23 Okla. Const. Fent has cited no cases in support of these propositions. It appears that the argument is that because no revenue stream is generated, such as by the sale of electricity or other services, the bonds are not self-liquidating and are in violation of the debt limitation provisions.

¶ 38 This bond issue is similar to previous bond issues approved by this Court. As early as 1960, this Court characterized bonds as self-liquidating where the legislature appropriated money to enable state agencies to pay the rent on the state office buildings to be constructed by the bond issue. There, the only source of revenue consisted of state appropriations. Application of Okla. Cap. Imp. Auth., 1960 OK 207, 355 P.2d 1028, 1031. In Application of Okla. Cap. Imp. Auth., 1998 OK 25, 958 P.2d 759, 764, the bonds were determined to be self-liquidating where a dedicated tax on motor fees and other special fuels, as well as vehicle licenses, were specifically earmarked to retire the bonds, as well as an apportionment of assessments levied under an environmentally-based indemnity fund and appropriations from the Rainy Day Fund.

¶ 39 In the present case, the primary source of payment of the bonds is the foregone incentive payments that Goodyear and Michelin are otherwise entitled to receive under the Oklahoma Quality Jobs Program Act, 68 O.S. § 3601 et seq. Instead of being paid these sums directly, the amounts will be transferred to the Quality Jobs Incentive Leverage Fund to be used for repayment of the bonds. See, 68 O.S. Supp.2002 § 3658(A). The Act specifically provides that the incentive payments shall be treated as an asset of the establishment that has been paid to the State of Oklahoma. 68 O.S. Supp.2002 § 3658(B). The Secretary of Commerce of the State of Oklahoma has certified that these foregone benefits are in amounts sufficient to pay the bonds. The

liability of the State of Oklahoma to make the incentive payments under the Oklahoma Quality Jobs Program Act is limited to the balance contained in the Quality Jobs Program Incentive Payment Fund. 68 O.S.2001 § 3605. Protester Fent has not taken exception to the incentive payments provided by the Oklahoma Quality Jobs Program Act; it is these same funds that are transferred to the Quality Jobs Incentive Leverage Fund to be used for repayment of the bonds. No debt is created thereby.

¶ 40 The second level of security consists of the employee withholding taxes attributable to the qualifying establishment that are transferred to the Fund in the amount needed each fiscal year if the incentive payments are not enough. Again, the amount to be transferred shall be determined in each fiscal year and there is no obligation to make the transfers beyond a fiscal year.

¶ 41 Michelin and Goodyear are also required to execute the Guaranty Agreement required by section 3654(M) of the Act that they will pay the debt service on the bonds if the incentive and withholding amounts are not sufficient. Section 3660 of the Act provides that if the establishment should cease to qualify for an incentive payment and if the withholding tax collections from the establishment are not sufficient to make required payments of principal and interest, it shall be liable to the ODFA for the amount of any required principal or interest payment.

¶ 42 If the foregoing are inadequate, 68 O.S. Supp.2002 § 2352(E) authorizes an allocation to the Quality Jobs Program Incentive Leverage Fund of income tax revenue for any period of time certified by the ODFA and the Oklahoma Department of Commerce to be necessary for the repayment of obligations issued under the Act. Again, the determination of amounts that may be required is determined for each fiscal year.

¶ 43 In addition, Section 11 of the Act,[20] which is not codified, contains an expression of intent on the part of the legisla-

**20.** Section 11 of Laws 2002, ch. 299, a new section of law not to be codified in the Oklahoma Statutes:

"If there are modifications to the income tax laws of the State of Oklahoma, enacted pursuant to legislation, adopted pursuant to referendum,

or otherwise, resulting in a significant decline in the amount of withholding taxes attributable to the wages of employees of an establishment that has filed the irrevocable election provided by Section 8 of this act, the Legislature declares its intent to direct such revenues for deposit into the

ture to provide for the payment of the bonds in the event the state income tax laws are changed. Protester Fent argues that the Legislature's promise to pay the future debts of the state Quality Jobs Program Incentive Leverage Fund is an unconstitutional violation of art. 10, §§ 23 and 25 of the Oklahoma Constitution. Section 11 provides that *if there are* changes to the income tax laws of the State of Oklahoma that result in a significant decline in the withholding taxes referred to in the Act, the Legislature *declares its intent* to direct such revenues for deposit into the Quality Jobs Program Incentive Leverage Fund as may be required in order for the ODFA to repay the obligations issued pursuant to the Act. Applicant points out that this later source of payment is merely a "moral obligation" to pay, just as in *Fent v. Okla. Cap. Imp. Auth.,* 1999 OK 64, 984 P.2d 200.

¶ 44 In *Fent,* the statutes under consideration authorized the Oklahoma Capitol Improvement Authority to issue bonds to fund various government projects ranging from the construction of a new building for the J.D. McCarty Center to the purchase of computer hardware and software for the Oklahoma Department of Central Services. The bonds were to be retired by payments made to the OCIA by the various departments and/or instrumentalities using and/or benefitting from the projects. The statutes expressed an intention to appropriate sufficient monies to the various agencies, etc., to make the payments to OCIA for retiring the bonds; nowhere in either statute was there a provision *obligating* future legislatures to do so. *Fent* at pp. 206–207. We determined that no debt as contemplated by Okla. Const., art. 10 §§ 23, 24 and 25 was created against the State if money was not appropriated and, thus, those provisions of our fundamental law were not applicable. 984 P.2d at 208.

¶ 45 Section 11 creates what are referred to as "moral obligation bonds." In *Application of Oklahoma Capitol Improvement Authority,* 1998 OK 25, ¶ 56, 958 P.2d 759, 775, we said:

"The statute specifically provides that bonds shall not at any time be deemed to constitute a debt of the state or of any political subdivision and it requires that the bonds contain on their face a statement that neither the full faith and credit nor the taxing power of the state or any political subdivision is pledged for the payment of the principal and interest of the bonds. There is no legally enforceable contract between this State's Legislature and either the Authority, the Department or the citizens of this state to make the anticipated appropriations necessary to satisfy the debts created by the issuance of the bonds. At most, a 'moral obligation' arises to continue funding."

¶ 46 In the instant case, the Act provides, and the bonds will reflect on the face thereof, that they do not constitute obligations of the State of Oklahoma. The Indentures and the Bonds provide:

THIS BOND IS BEING ISSUED UNDER THE PROVISIONS OF THE OKLAHOMA DEVELOPMENT FINANCE AUTHORITY ACT AND IT SHALL NEVER CONSTITUTE AN INDEBTEDNESS OF THE STATE OF OKLAHOMA WITH IN THE MEANING OF ANY STATE CONSTITUTIONAL PROVISION OR STATUTORY LIMITATION, BUT SHALL BE INDEBTEDNESS PAYABLE SOLELY FROM SOURCES INDICATED HEREIN, AND SHALL NEVER CONSTITUTE NOR GIVE RISE TO A PECUNIARY LIABILITY OF THE STATE OF OKLAHOMA OR UNSPECIFIED FUNDS OF THE OKLAHOMA DEVELOPMENT FINANCE AUTHORITY OR A CHARGE AGAINST THE GENERAL CREDIT OF THE STATE OF OKLAHOMA OR TAXING POWER OF THE STATE OF OKLAHOMA.

We said in *Fent v. Oklahoma Capitol Improvement Authority,* 984 P.2d at 208:

"Unquestionably, provisions obligating future legislatures are unconstitutional. However, here there is simply nothing to bind future legislative bodies to make the anticipated appropriations. Future revenues are not pledged ... for retirement of

Quality Jobs Program Incentive Leverage Fund as may be required in order for the Oklahoma Development Finance Authority to repay the obli-

gations issued and outstanding pursuant to Section 4 of this act."

the proposed bonds. The present Legislature's intent to appropriate the monies is not a binding commitment on future legislatures to do so." (quoting from *Application of Oklahoma Capitol Improvement Authority,* 1998 OK 25, 958 P.2d 759, at 771)

## CONCLUSION

¶ 47 Title 20 O.S.2001 § 14.1 provides that if the Court is satisfied that the obligations have been properly authorized in accordance with the law and that, when issued, they will constitute valid obligations in accordance with their terms, the Court shall render its written opinion approving the obligations. Accordingly the bond issue is approved. Any petition for rehearing in regard to this matter shall be filed within twenty (20) days of the date of this opinion.

## ORIGINAL JURISDICTION ASSUMED; PROPOSED BOND ISSUE APPROVED.

¶ 48 Concur: WATT, C.J., HODGES, HARGRAVE, WINCHESTER, EDMONDSON, JJ.

¶ 49 Dissent: OPALA (joins BOUDREAU, J.), V.C.J., LAVENDER (joins BOUDREAU, J.), BOUDREAU (by separate writing), JJ.

¶ 50 Recused: KAUGER, J.

BOUDREAU, J., dissenting, with whom OPALA, V.C.J. and LAVENDER, J., join:

¶ 1 I dissent from today's opinion which approves bond proposals for the renovation and expansion of two private industrial facilities without an antecedent vote of the people. With this opinion and two previous opinions approving bond proposals, *Application of Oklahoma Capitol Improvement Authority,* 1998 OK 25, 958 P.2d 759 and *Fent v. Oklahoma Capitol Improvement Authority,* 1999 OK 64, 984 P.2d 200, this Court has abandoned its traditional role as protector of our state constitution in favor of a partnership role with the Legislature promoting economic development in Oklahoma. These three opinions allow the Legislature free rein to create debts to be retired solely or partially from future state tax revenues while circumventing a vote of the people. They have, in effect, rendered our constitutional debt limitations meaningless.

## I. OKLAHOMA CONSTITUTIONAL DEBT LIMITATIONS

¶ 2 The Oklahoma Constitution, art. 10, §§ 23, 24 and 25 specify the fundamental limitations on state debts. Section 23 requires the Legislature to balance the state budget annually and prohibits state agencies from incurring obligations in excess of the unencumbered balance of cash on hand.[1] The obvious intent of this section is to prohibit multi-year debts and to place state government on a pay-as-you-go cash basis.[2] Section 25 permits the creation of a multi-year debt if the Legislature enacts a measure that distinctly specifies the object of the debt and provides for payment of the debt.[3] Section 25 requires that the measure then be approved by the people at a general election.

1. Art. 10, § 23, reads in pertinent part:
   The state shall never create or authorize the creation of any debt or obligation, or fund or pay any deficit, against the state, or any department, institution or agency thereof, regardless of its form or the source of money from which it is to be paid, except as may be provided in this section and in Sections 24 and 25 of Article X of the Constitution of the State of Oklahoma.
   To ensure a balanced annual budget, pursuant to the limitations contained in the foregoing, procedures are herewith established as follows:
   . . .
   5. . . . Any department, institution or agency of the state operating on revenues derived from any law or laws which allocate the revenues thereof to such department, institution or agency shall not incur obligations in excess of the unencumbered balance of cash on hand. . . .

2. *State ex rel. Kerr v. Grand River Dam Authority,* 1945 OK 9, ¶ 11, 195 Okla. 8, 154 P.2d 946, 950.

3. Article 10, § 25 provides:
   Except the debts specified in sections twenty-three and twenty-four of this article, no debts shall be hereafter contracted by or on behalf of this State, unless such debt shall be authorized by law for some work or object, to be distinctly specified therein; and such law shall impose and provide for the collection of a direct annual tax to pay, and sufficient to pay, the interest on such debt as it falls due, and also to pay and discharge the principal of such debt within twenty-five years from the time of the contracting thereof. No such law shall take effect until it shall, at a general election, have been submitted to the people and have received a majority of all the votes cast for and against it at such election. On the final passage of such bill

Very clearly, Section 25 **reserves in the people of Oklahoma** the power to determine whether the state should incur multi-year debts other than as may be necessary in certain emergency situations.[4]

## II. TODAY'S OPINION

¶3 In approving industrial facility bonds without an antecedent vote of the people, today's opinion characterizes the bonds as moral obligations under *Fent v. Oklahoma Capitol Improvement Authority*, 1999 OK 64, 984 P.2d 200 (1999 *Fent*). The opinion reasons that these bonds do not create a legally binding obligation against the state nor pledge the full faith and credit of the state because language in the authorizing statute and on the face of the bonds disavows the creation of a state debt.[5] The opinion views this *ipse dixit* language as sufficient to avoid any legal obligation on the part of the state to retire the bonds. Accordingly, the opinion

concludes the bonds are not subject to our constitutional debt limitations.

¶4 In reaching the conclusion that the proposed bonds will be moral obligations, the opinion ignores the language in the authorizing statutes that provide for the bonds to be retired from state income tax revenues to be collected over a multi-year period.[6] The Oklahoma Quality Jobs Incentive Leverage Act (Act) identifies four sources for retirement of the bonds.[7] These sources are also specified in the bond indenture.[8] Except the guaranty of the private industry receiving the benefit of the bond proceeds, all sources consist of state income tax revenues. The first source is a special fund in the State Treasury known as the Quality Jobs Program Incentive Leverage Fund [9] consisting of monies from the Quality Jobs Program Incentive Payment Fund [10] and income tax

---

in either House of the Legislature, the question shall be taken by yeas and nays, to be duly entered on the journals thereof, and shall be: "Shall this bill pass, and ought the same to receive the sanction of the people?"

4. Article 10, § 24 provides:

In addition to the above limited power to contract debts, the State may contract debts to repel invasion, suppress insurrection or to defend the State in war; but the money arising from the contracting of such debts shall be applied to the purpose for which it was raised, or to repay such debts, and to no other purpose whatever.

5. The face of the bond will state that "IT SHALL NEVER CONSTITUTE AN INDEBTEDNESS OF THE STATE OF OKLAHOMA WITHIN THE MEANING OF ANY CONSTITUTIONAL PROVISION" and it "SHALL NEVER CONSTITUTE ... A CHARGE AGAINST THE GENERAL CREDIT OF THE STATE OF OKLAHOMA OR TAXING POWER OF THE STATE OF OKLAHOMA."

6. Issuance of these bonds is authorized in the Oklahoma Quality Jobs Incentive Leverage Act, 2002 Okla. Sess. Laws, ch. 299, 68 O.S.Supp. 2002, §§ 3651, et seq.

7. *Id.*

8. Article IV of the Indenture of Trust recognizes that the trust estate, from which the bonds are to be retired, will consist of state income tax reve-

nues that 1) would have been paid to Goodyear or Michelin as quality jobs incentive payments, 2) will be attributable to withholding from employees of Goodyear or Michelin, and, 3) will be apportioned to cover any deficit after payment or default under the guaranty agreement.

9. All monies in the Quality Jobs Program Incentive Leverage Fund in the State Treasury, created in 68 O.S.Supp.2002, § 3657, are to be used for the payment of principal, interest and other costs associated with the issuance of obligations pursuant to the Act.

10. The Oklahoma Quality Jobs Program Act, 1993 Okla. Sess. Laws, ch. 275, 68 O.S.Supp. 1993, §§ 3601 et seq., authorizes the Oklahoma Tax Commission to make quarterly incentive payments to qualifying establishments for new direct jobs. The incentive payments are calculated upon a net benefits formula and may be claimed for no longer than a ten-year period. § 3604. The Oklahoma Tax Commission deposits a portion of the withholding income taxes into the Quality Jobs Program Incentive Payment Fund in the State Treasury and pays the claimed incentive payments from that special fund. § 3605. The Oklahoma Tax Commission is directed to transfer monies from the Quality Jobs Program Incentive Payment Fund to the Quality Jobs Program Incentive Leverage Fund in the amounts that a qualifying establishment would be entitled to claim for new jobs but foregoes under the Oklahoma Quality Jobs Incentive Leverage Act. 68 O.S.Supp.2002, § 3658.

revenues withheld from employees of the private industry.[11] If the deposits in the special Leverage Fund are insufficient to pay the principal or interest on the bonds when due, then the private industry must make the payment under its guaranty executed for the benefit of the Oklahoma Development Finance Authority.[12] Upon default under the guaranty, state income tax revenues shall be apportioned in amounts sufficient to pay the obligations.[13]

¶ 5 While characterizing the proposed bonds as moral obligations, the opinion also describes the bonds as self-liquidating under *Application of Oklahoma Capitol Improvement Authority*, 1998 OK 25, 958 P.2d 759 (1998 *OCIA*). The opinion concludes that the bonds (thirty-six million dollars for Goodyear and twenty-nine million dollars for Michelin) are self-liquidating because the primary source for retiring the bonds is the foregone quality jobs incentive payments which the Legislature declared to be an asset of the private entity.[14] Although the record shows that the amount of the foregone incentive payments is estimated to be just under

two million dollars for each private industry,[15] the opinion indicates that these foregone benefits are in amounts sufficient to pay the bonds.

¶ 6 In applying the self-liquidating debt exception, the opinion ignores two important aspects of the exception. First, the exception is relevant only if the bonds are debts in the constitutional sense. If the Court truly views these bonds as moral obligations rather than multi-year debts, there is no need to consider the self-liquidating debt exception. Second, the exception applies only if the **projects** funded with the bond proceeds generate streams of revenue dedicated to retiring the bonds. While the opinion implies that the streams of revenue that will be generated by renovating and expanding the Goodyear tire plant in Lawton and the Michelin tire plant in Ardmore and dedicated to retiring the bonds are the foregone quality jobs incentive payments, the real source of the payment will be future income tax revenues.

---

11. Quality Jobs Program Incentive Payment Fund consists of state income tax revenues in amounts equal to the incentive payment which the private industry receiving the bond proceeds might be entitled to claim as a new jobs benefit incentive and which the Oklahoma Tax Commission transfers from its holding account to the Quality Jobs Program Incentive Payment Fund in the State Treasury and then to the Quality Jobs Program Incentive Leverage Fund. See note 9 supra. The Oklahoma Tax Commission is also directed to apportion withholding income taxes to the Quality Jobs Program Incentive Leverage Fund. 68 O.S.Supp.2002, § 3659. Withholding tax refers to the mechanism for collection of the state income tax from the employee via the employer. 68 O.S.2001, §§ 2385.1 et seq. Withholding tax, when remitted to the Oklahoma Tax Commission, are state income tax revenues.

12. The guaranty is required by 68 O.S.Supp. 2002, § 3654(M). The Act also provides that the private industry "shall be liable to the State of Oklahoma and the Oklahoma Development Finance Authority for the amount of any required principal or interest payment" when the private industry "ceases to qualify for an incentive payment". 68 O.S.Supp.2002, § 3660.

13. Section 13 of the 2002 legislative measure amended the income tax apportionment statute, 68 O.S.2001, § 2352. Although § 2352 has been subsequently amended, the changes made in 2002 remain intact. In the 2002 changes, the Legislature mandated that for fiscal year 2004 and subsequent fiscal years, before any other apportionments of income tax revenues are made, the Oklahoma Tax Commission shall apportion collections of the income tax levied in 68 O.S.2001, § 2355 to the Quality Jobs Program Incentive Leverage Fund in amounts as may be certified by the Oklahoma Development Finance Authority to be necessary to pay the obligations. 2002 Okla. Sess. Laws, ch. 299, § 13.

14. 68 O.S.Supp.2002, § 3658(B).

15. The Oklahoma Development Finance Authority proposes to borrow $36,720,000.00 for Goodyear while Goodyear has agreed to forego a total of $1,969,748.80 in incentive payments and $29,615,000.00 for Michelin while Michelin also has also agreed to forego a total of $1,969,748.80. See, Applicant's Appendix, Exhibits M and N, unsigned certificates of the Secretary of Commerce of the State of Oklahoma. Also, it is noteworthy that according to the statute, the foregone incentive benefits are to be paid quarterly over a ten-year period, 68 O.S.Supp.

### III. WHETHER A BOND ISSUE CONSTITUTES A STATE DEBT IN A CONSTITUTIONAL SENSE IS A LEGAL QUESTION TO BE DECIDED BY THIS COURT. *FENT V. OKLAHOMA CAPITOL IMPROVEMENT AUTHORITY,* 1999 OK 64, 984 P.2d 200, SHOULD BE OVERRULED TO THE EXTENT THAT IT ALLOWS THE LEGISLATURE TO AVOID THE AUTHORIZING OF STATE DEBT BY MERELY DECLARING THAT THE OBLIGATION WILL NOT CONSTITUTE A DEBT OF THE STATE.

¶ 7 The notion of appropriation-risk or moral obligation bonds emerged as part of the rationale in the 1998 *OCIA* opinion. In approving proposed highway improvement bonds authorized in 73 O.S.Supp.1997, § 168.6, the 1998 *OCIA* opinion reasoned that the highway bonds could be viewed as creating a moral obligation rather than creating a debt within the meaning of our state constitution because the statute did not bind future Oklahoma legislatures to make the anticipated appropriations.[16] It further rea-

soned that the full faith and credit of the state was not pledged by the appropriation-risk or moral obligation bonds because there was only the prospect as opposed to the promise of future appropriations to retire the bonds.[17] However, the holding of the 1998 *OCIA* opinion is not grounded in its appropriation-risk, moral-obligation discussion but rests squarely on the self-liquidating debt exception to the constitutional debt limitation provisions.[18]

¶ 8 It was not until the 1999 *Fent* opinion that this Court's approval of a bond issue without an antecedent vote of the people actually rested on the notion that an appropriation-risk or moral obligation of the state is not a debt under our constitutional debt limitation provisions.[19] The 1999 *Fent* case involved a bond proposal to fund the needs of several state agencies. Although the bonds would be retired with state revenues appropriated in subsequent years, the 1999 *Fent* opinion concluded that the bonds would not create a state debt in the constitutional sense.[20] The Court reasoned that succeeding legislative bodies would not be bound to appropriate future state revenues to the agen-

---

2002, § 3604(A), while the proposed bonds will have a twenty-year maturity date.

**16.** *Application of Oklahoma Capitol Improvement Authority,* 958 P.2d at 771.

**17.** *Application of Oklahoma Capitol Improvement Authority,* 958 P.2d at 774.

**18.** Approval of the proposed bonds in the 1998 *OCIA* opinion rested on the conclusion that "THE BONDS ARE SELF–LIQUIDATING" in ¶ 10 and that the "bonds are, in the most elemental sense, 'self-liquidating'" in ¶ 11. The 1998 *OCIA* opinion emphasized that its approval of the proposed bonds rested on the self-liquidating debt exception when, at the beginning of its discussion of other arguments presented in support of the bond proposal, it said at ¶ 19:

> The analysis presented in Proposition II demonstrates that the dedicated revenue stream described in the authorizing statute satisfies the standard of self-liquidation as described in our prior decisions. **Even if it did not, or even if the highway proposal were not *fully* self-liquidating,** this Court's prior decisions would not warrant its invalidation. (Bold added.)

*Application of Oklahoma Capitol Improvement Authority,* 958 P.2d at 766. Accordingly, the discussion regarding moral obligations in the 1998 *OCIA* opinion was not essential to the Court's resolution of the case and could be viewed, at its very best, as persuasive judicial

dicta. *Stark v. Watson,* 1961 OK 17, 359 P.2d 191, 196.

**19.** In *Application of Oklahoma Capitol Improvement Authority,* 1960 OK 207, ¶¶ 11–13, 355 P.2d 1028, 1031, this Court concluded that a state debt was not created where the Legislature authorized the borrowing of money for acquisition or construction of a project to be used by a state agency in order to carry out its duties and the borrowed money was to be repaid from rentals paid by the state agency. This Court recognized, in that case, that the state office building project did not fit into the self-liquidating debt exception because the revenue to be generated by the project would be rents paid by state and federal agencies occupying space in the project office building and the rents paid by the state agencies would necessarily be from state revenue. Considering whether future legislatures may be bound to appropriate public funds to pay the rents to retire the bonds, i.e., appropriation-risk bonds, the Court observed that any contract to pay money in the future creates a debt and concluded that governmental contracts for future installments for services to be received in the future are excluded from the provisions governing governmental indebtedness. *Id.,* at 355 P.2d at 1032–33.

**20.** *Fent v. Oklahoma Capitol Improvement Authority,* 984 P.2d at 210.

cies to retire the bonds and therefore the bonds would not be legally enforceable obligations of the state but only appropriation-risk or moral obligations of the state.[21]

¶ 9 In my view the 1999 *Fent* opinion should be overruled to the extent that it allows the Legislature to avoid the authorizing of state debt by merely declaring in a statute that the obligation shall not constitute a debt of the state. Whether a bond issue constitutes a state debt in a constitutional sense is a legal question to be decided by this Court. *Boswell v. State*, 1937 OK 727, 181 Okla. 435, 74 P.2d 940, 943. It is certainly not a question to be decided by the stroke of a legislative pen. As this Court said in *Boswell v. State*, the Legislature might dictate that neither the full faith and credit nor the taxing power of the state will be pledged as security for the bonds, but it may not declare the legal character of the bond indenture. *Id.*

¶ 10 Before approving any proposed bond issue, this Court should thoroughly examine the financial realities of the proposed bond transaction without deference to the Legislature's legal characterization of the bonds. In this regard, one commentator has observed that "the very use of the term 'bond' manifestly interweaves the idea of obligations, indebtedness, and liabilities."[22] Certainly, the bond transactions in the 1998 *OCIA* case for highway improvement and in the 1999 *Fent* case for state building and equipment and in this case for private industrial facilities look and act like debt. In the previous cases, the bondholders conferred benefits upon the people of Oklahoma by providing funds for public improvement projects. In this case, the bondholders will confer a benefit upon the people of Oklahoma by providing funds for economic development. It utterly defies belief that the bondholders would purchase these bonds without an implied commitment of the state's general taxing power.

¶ 11 The notion of moral obligation is foreign to our American system of finance. Bankers and other lenders simply do not make multi-million dollar loans on moral promises of the borrowers to repay the loan. When the Legislature authorizes a state entity to issue bonds, bondholders expect the bonds to be backed by the state's general taxing power. To maintain otherwise is just denying economic reality.

¶ 12 In his dissenting opinion in the 1998 *OCIA*, Justice Watt correctly perceived this economic reality when he said that "whether these proposed bonds are labeled 'legal' or 'moral,' the economic reality is that the State's failure to repay the bondholders in full would be devastating to Oklahoma's credit worthiness".[23] Similarly, in his dissenting opinion in that case, Justice Lavender recognized that future legislatures will be bound to appropriate sufficient revenues to repay the bondholders and to rule otherwise "simply ignores the economic reality of the situation".[24]

¶ 13 In summary, the 1999 *Fent* opinion should be overruled to the extent that it supports the rationale that the Legislature may avoid creating a legally binding obligation against the state by simply saying so while diverting tax revenues to the obligation. By giving our legal imprimatur to this technique of circumvention we have opened the door to large-scale state deficit financing and rendered our constitutional debt limitations meaningless.

## IV. THIS COURT SHOULD CLARIFY THE SELF–LIQUIDATING DEBT EXCEPTION TO ART. 10, §§ 23 and 25 OF THE OKLAHOMA CONSTITUTION BY DEFINING THE ELEMENTS OF THE EXCEPTION.

¶ 14 Although bonds evidence debt owed by the issuing entity,[25] this Court has fash-

---

21. *Id.*, 984 P.2d at 208.

22. Oklahoma Constitutional Law: Highway Robbery: *In re Oklahoma Capitol Improvement Authority:* The Eulogy for Oklahoma Constitutional Debt Limitations, by Brian Edward Wheeler, 53 Okla. L.R. 319, 335 (Summer, 2000).

23. *Application of Oklahoma Capitol Improvement*

*Authority, supra.,* dissenting opinion by Watt, J., at 958 P.2d 787, 794.

24. *Application of Oklahoma Capitol Improvement Authority, supra.,* dissenting opinion by Lavender, J., at 958 P.2d 778, 779.

25. It is indisputable that bonds are evidence of a debt in a constitutional sense. *See*, Okla. Const., art. 10, § 29.

ioned a self-liquidating debt exception to the state debt limitations in Okla. Const., art. 10, §§ 23 and 25. The self-liquidating debt exception originated in *Baker v. Carter,* 1933 OK 484, 165 Okla. 116, 25 P.2d 747, wherein the Court was asked to approve a bond proposal for the construction of a state college dormitory which dedicated the rents paid by the students to a special fund to retire the bonds. In approving the bonds without an antecedent vote of the people, *Baker v. Carter* ruled that the constitutional debt limitation provisions were inapplicable to bonds payable solely out of a special fund of revenues generated by the improvement made with the bond proceeds. *Id.,* 25 P.2d at 758.

¶ 15 Shortly thereafter, *Boswell v. State,* 1937 OK 727, 181 Okla. 435, 74 P.2d 940, clarified the special fund language in *Baker v. Carter,* expressly defining and limiting the self-liquidating debt exception to bond proposals which called for the bond proceeds to be used for projects that would generate revenue directly from the project users and that revenue would be the sole source for retiring the bonds.[26] That case presented a bond proposal for highway improvement with the bonds to be retired from gasoline excise tax earmarked for deposit in the special State Highway Commission Note Fund of 1937 in the State Treasury. *Boswell v. State* determined that the bonds were to be retired with revenue raised by the state taxing power and consequently, the project and bonds were not self-liquidating.

¶ 16 Our early cases never applied the exception to bond obligations that would be liquidated or retired by an infusion of funds from the general revenues of the state. *Boswell v. State,* 74 P.2d at 949. As initially developed, the self-liquidating debt exception to our constitutional debt limitation provisions applied to bond obligations to be retired **only** from a stream of revenue derived from the project constructed with the bond proceeds. Accordingly, we applied the exception to dormitories, public lodges, toll roads and other projects that can be leased or rented or used as collateral in the event of default on the obligation. *See, Baker v. Carter, supra., Application of Board of Regents of University of Oklahoma,* 1945 OK 224, 195 Okla. 641, 161 P.2d 447, and *Application of Board of Regents for Oklahoma Agricultural and Mechanical Colleges,* 1946 OK 110, 196 Okla. 622, 167 P.2d 883 (wherein the bonds financed construction of dormitories at our state colleges and universities and were retired from the fees and rents paid by students.); *Application of Oklahoma Planning and Resources Board,* 1949 OK 34, 201 Okla. 178, 203 P.2d 415 (wherein the bonds financed construction of a lodge, cabins and a restaurant at a state park and were retired from the charges for the conveniences paid by the park visitors); and *Application of Oklahoma Turnpike Authority,* 1950 OK 208, 203 Okla. 335, 221 P.2d 795 (wherein the bonds financed construction of turnpike roadways and were retired from the toll fees paid by the highway users).

---

**26.** Restricting the special fund theory in *Baker v. Carter* to debts to fund self-liquidating projects, the *Boswell* opinion reasoned:

¶ 42 It is said that the "special fund doctrine" has been recognized and applied by this court in the case of *Baker v. Carter,* 165 Okla. 116, 25 P.2d 747, and so it has. It is urged that the recognition of said doctrine in that case constitutes a precedent for the validity of the act under consideration herein. In that case, however, a public corporation, the Agricultural and Mechanical College of this state, was authorized to issue certain certificates of indebtedness for the purpose of constructing a dormitory, *the sole provision for payment* being in revenues produced from the rental of the conveniences of said dormitory. The revenues which were to create the special fund had no existence prior to the issuance of the obligations; they were to arise wholly out of the property created by the use of the proceeds of

the bonds authorized. The fund created was in no sense derived from a tax of any kind. No property of the state already producing income was to be utilized in any way to help create the special fund. The public revenues of the state were not concerned. The contemplated asset was to be a self-liquidating project. . . .

¶ 47 A careful study of the various authorities cited by defendants discloses that in some jurisdictions the failure to observe the distinction between a particular fund derived from a specific tax levied for a specific purpose, which has been termed a "special fund," and a fund partaking of the nature of a trust fund derivable from a self-liquidating project under the "special fund doctrine," has led to a confused interpretation and to an unwarranted extension of the "special fund doctrine," which we refuse to follow.

*Boswell v. State,* 74 P.2d at 949–50.

¶ 17 However, in the 1998 *OCIA* opinion, this Court once again addressed the self-liquidating exception. In approving bonds for the construction and maintenance of highways, the Court determined the bonds were self-liquidating because prepaid direct and dedicated taxes on fuels and user fees were specifically earmarked to retire the bonds on an annual basis.[27] In the Court's view, the combination of taxes and fees created a revenue stream directly related to the construction and maintenance of highways.[28]

¶ 18 The 1998 *OCIA* opinion expanded the self-liquidating debt exception, approving the type of financing that we specifically rejected in *Boswell v. State, supra.* Today's opinion goes even further, approving a state entity's proposed transactions to create multi-year debts, the proceeds of which will be invested in private industrial facilities for the purpose of economic development, to be paid from dedicated future income tax revenues. Our recent jurisprudence has created a self-liquidating debt exception that is without boundaries. It has allowed the Legislature, contrary to the teachings of *Boswell v. State, supra,* to authorize multi-year debts by creating so-called special funds composed of future state revenues that could be available for governmental functions.

¶ 19 In my opinion, we should reaffirm our holding in *Boswell v. State, supra,* and specifically disapprove of the Legislature's attempt to divert future tax revenues to the payment of public obligations without the consent of the voters. In so doing, this Court should clarify the self-liquidating debt exception to the constitutional debt limitation provisions by setting forth the elements of the exception.[29]

## V. CONCLUSION

¶ 20 In summary, I dissent from today's opinion because it allows a state entity to borrow money to be repaid from income tax collections over a twenty-year period without an antecedent vote of the people. Were I writing for the Court, we would overrule *Fent v. Oklahoma Capitol Improvement Au-*

*thority,* 1999 OK 64, 984 P.2d 200, to the extent that it allows the legislature to avoid the authorizing of state debt by merely declaring that an obligation will not constitute a debt of the state. We would also clarify the self-liquidating debt exception to the constitutional debt limitation provisions by defining the elements of the exception.

¶ 21 In accordance with our state constitution, a bond issue must be submitted to the electorate for approval at a general election. Notwithstanding that the purpose of a bond proposal may be commendable, this Court must reject proposed public financing that is contrary to this fundamental law. It is time for us to put a firm cap on debt limitation escape devices and return to our pre 1998 jurisprudence.

---

27. *Application of Oklahoma Capitol Improvement Authority,* 958 P.2d at 764.

28. *Id.*

29. *See, Application of Oklahoma Capitol Improvement Authority, supra.,* dissenting opinion by Opala, J., at 958 P.2d 779, 780–81, for one suggestion of the elements of the exception.